[Civ. No. 22741. Fourth Dist., Div. One. May 12, 1981.]

CITY OF SAN DIEGO, Plaintiff and Appellant, v. CALIFORNIA COASTAL COMMISSION, Defendant and Respondent.

COUNSEL

John W. Witt, City Attorney, Ronald L. Johnson, Chief Deputy City Attorney, and Kenneth So, Deputy City Attorney, for Plaintiff and Appellant.

George Deukmejian, Attorney General, N. Gregory Taylor, Assistant Attorney General, Anthony M. Summers and Timothy R. Patterson, Deputy Attorneys General, for Defendant and Respondent.

OPINION

WIENER, J.—The City of San Diego (City) applied for a permit from the San Diego Coast Regional Commission to realign and widen a portion of Carmel Valley Road adjacent to the Los Penasquitos Lagoon.[1] The regional commission approved the permit subject to conditions that limited the improvement of the road to two lanes and a bike path and required restoration of wetlands in an amount equal to two times the amount of wetlands filled by realignment of the road. The regional commission's decision was appealed to the California Coastal Commission (Commission) for a de novo hearing. (Pub. Resources Code, § 30621.)[2] The Commission denied the permit application as conditioned by the regional commission because "the development would not be in conformity with the provisions of Chapter 3 of the California Coastal Act of 1976, would prejudice the ability of the local government having

---

[1]Carmel Valley Road is a two-lane road connecting Interstate 5 and Highway 101. Los Penasquitos Lagoon is located immediately south of Carmel Valley Road. The road has a pavement width of 24 feet within the area of proposed construction and is a curve with a radius of 350 feet. Coming out of the turn, the road curves in the other direction, constituting a reverse curve. The proposed project is part of a City plan to widen Carmel Valley Road into a four-lane thoroughfare. The City submitted two alternative alignments, both providing for widening the road and requiring a portion of the wetlands of the lagoon to be filled and the removal of a portion of the bluffs to the north.

The City claimed the proposed construction was necessary because of safety reasons. Two fatal accidents occurred at the site of the proposed alignment in 1977 and 1978; four accidents in 1975, six accidents in 1976, seven accidents and eight injuries in 1977, and six injuries in 1978.

[2]All statutory references are to the Public Resources Code unless otherwise specified.

jurisdiction over the area to prepare a Local Coastal Program conforming to the provisions of Chapter 3 of the California Coastal Act of 1976 and would have a significant adverse impact on the environment within the meaning of the California Environmental Quality Act and feasible alternatives exist which would substantially reduce these adverse impacts." The City's petition for writ of mandate in the superior court pursuant to Code of Civil Procedure section 1094.5 was denied. This appeal ensued.

The issue presented is whether the Commission's findings are supported by substantial evidence. We affirm the judgment.

### Applicable Law

The parties agree this matter is governed by the substantial evidence test. Generally, "If the trial court was limited to the substantial evidence test . . ., 'the trial and appellate courts occupy identical positions with regard to the administrative record, and the function of the appellate court, like that of the trial court, is to determine whether that record is free from legal error.' (*Merrill* v. *Department of Motor Vehicles*, 71 Cal.2d 907, 915-916 [80 Cal.Rptr. 89, 458 P.2d 33].) Thus, . . . the appellate court itself reviews the administrative record to determine whether the agency's decision was supported by substantial evidence. (*Bixby* v. *Pierno*, 4 Cal.3d 130, 143, fn. 10, 149 [93 Cal.Rptr. 234, 481 P.2d 242].)" (*Patterson* v. *Central Coast Regional Com.* (1976) 58 Cal.App.3d 833, 842 [130 Cal.Rptr. 169].) Further, we are mindful that " . . . every presumption in favor of the administrative findings which may ordinarily be accorded to such determinations of the trier of fact should be indulged to support the administrative findings on these factual matters. Up to the point where the court cannot, in good conscience, say that the administrative evidence supporting those findings and inferences of fact is substantial, in that there is no reasonable relation between the facts and the findings, the court should not substitute its judgment for that of the agency, even though, had the court heard the case de novo it would not have reached the same findings of fact itself. [Citations.]" (*Pranger* v. *Break* (1960) 186 Cal.App. 2d 551, 559-560 [9 Cal.Rptr. 293].) Finally, the opinion evidence of experts in the discipline of environmental planning, often included within environmental impact reports, may constitute substantial evidence upon which the Commission may have based its decision. (*Coastal Southwest Dev. Corp.* v. *California Coastal Zone Conservation Com.* (1976) 55 Cal.App.3d 525, 532 [127 Cal.Rptr. 775].)

*Discussion*

I

██ The City first urges the record is devoid of substantial evidence supporting the finding the project would not be in conformity with chapter 3 of the California Coastal Act of 1976. Relying on section 30001.5, the City stresses the goals of the act include the assurance of the "... orderly, balanced utilization and conservation of coastal zone resources taking into account the social and economic needs of the ... state" (subd. (b)) and the maximization of "... public access to and along the coast...." (Subd. (c).) Stressing further that public safety needs must be considered (§ 30210), the City argues there is substantial evidence that Carmel Valley Road is dangerous, while there is no substantial evidence in support of the findings a design speed of 35 miles per hour would be consistent with the safe speed of the remainder of the road and that any improvements to the road must be accomplished without filling the wetlands.

A coastal development permit shall not be approved by the Commission on appeal if the proposed development is not in conformity with the provisions of the act. (§ 30604, subd. (a).) The declared policy of the act is predicated upon the legislative finding the California coastal zone is a distinct and valuable natural resource characterized as "a delicately balanced ecosystem" (§ 30001, subd. (a)), the permanent protection of which is "a paramount concern to present and future residents of the state and nation" (§ 30001, subd. (b); *Stanson* v. *San Diego Coast Regional Com.* (1980) 101 Cal.App.3d 38, 46 [161 Cal.Rptr. 392]). The stated goals of the act are to: "(a) Protect, maintain, and, where feasible, enhance and restore the overall quality of the coastal zone environment and its natural and manmade resources.

"(b) Assure orderly, balanced utilization and conservation of coastal zone resources taking into account the social and economic needs of the people of the state.

"(c) Maximize public access to and along the coast and maximize public recreational opportunities in the coastal zone consistent with sound resources conservation principles and constitutionally protected rights of private property owners.

"(d) Assure priority for coastal-dependent and coastal-related development over other development on the coast.

"(e) Encourage state and local initiatives and cooperation in preparing procedures to implement coordinated planning and development for mutually beneficial uses, including educational uses, in the coastal zone." (§ 30001.5.)  ■  In reviewing an application for a permit, the Commission must ". . . undertake a delicate balancing of the effect of each proposed development upon the environment of the coast" (*State of California* v. *Superior Court* (1974) 12 Cal.3d 237, 248 [115 Cal. Rptr. 497, 524 P.2d 1281]) and the often conflicting goals noted above. When conflicts between the cited goals and policies of the act occur, they must ". . . be resolved in a manner which on balance is the most protective of significant coastal resources." (§ 30007.5; *Billings* v. *California Coastal Com.* (1980) 103 Cal.App.3d 729, 739 [163 Cal.Rptr. 288].)

■  There is substantial evidence to support the Commission's findings establishing that it delicately balanced the competing interests of the protection of a significant natural resource and the resolution of a road safety problem it determined could be mitigated without alteration of Los Penasquitos Lagoon.

Los Penasquitos Lagoon is one of the last natural coastal wetlands in San Diego County, constituting one of the nineteen highest priority wetlands identified under section 30233, subdivision (c). In pertinent part, that statutory provision states: "Any alteration of coastal wetlands identified by the Department of Fish and Game, . . . shall be limited to very minor incidental public facilities, restorative measures, nature study . . . ." In fact, the Department of Fish and Game analyzed the City's project, concluding it conflicted with section 30233, subdivision (c), and the Wetland Preservation Policy of the State Resource Agency. The department urged the Commission not to allow any fill material to be placed in the lagoon. Moreover, the United States Fish and Wildlife Service reviewed the matter and objected to any filling of the lagoon because of its unique and "especially sensitive" nature due to the presence of federally controlled endangered species, the light-footed clapper rail and the California least tern. Finally, the City itself in an adopted environmental impact report (EIR) pertaining to Carmel Valley Estates, a proposed 102-unit subdivision immediately north of the project in controversy, stated the lagoon ". . . is composed of salt water wetlands,

a rare habitat resource greatly depleted in California ... [and is] part of the critical habitat for [three endangered species] ...."

Further, there was substantial evidence establishing that although the curve in controversy posed safety problems, it did not constitute a major hazard. The City's EIR on the Carmel Valley Estates Project notes that "the traffic accident problem is minor at the present time (Federhard and Associates, 1978)." The appendix to the EIR, entitled "Traffic Impact Analysis for Carmel Valley Estates," reiterates this proposition. Finally, in 1979, the City's senior traffic engineer reviewed the number of accidents on the particular stretch of the roadway, concluding the overall accident frequency was "relatively low," but that the problem should not be minimized because of "the concentration and pattern" of the accidents.

Upon reviewing the number of accidents during the previous years, the Commission's staff report, which was adopted by the Commission on August 15, 1979, explains: "[A]ccidents are deplorable, and fatal accidents, of course, tragic; accordingly, the Commission believes that the City of San Diego should not be prevented from improving the unsafe situation caused by the existing low-radius curve and the reverse curve coming out of that turn. The Commission believes that a moderate, two-lane curve-straightening project could be approved without requiring fill in the Los Penasquitos Lagoon wetland or prejudicing the widening question. Unfortunately, the City of San Diego is to this point unwilling to consider such a project. The City continues to contend that only the City's design policies are relevant, and those policies require the extensive design proposed. In essence, the City is arguing that these policy decisions of the City's traffic engineers cannot be subject to other policy considerations. The Commission disagrees...."

Consequently, the Commission has succeeded in balancing the conflicting goals of preserving natural resources while maximizing access to the coast consistent with the needs of the public. The Commission is legislatively charged with the maintenance of the biological productivity and quality of the remaining wetlands (§ 30231) and the protection of environmentally sensitive habitat areas against significant disruption while permitting only uses dependent on such resources within such areas (§ 30240, subd. (a)). Further, development adjacent to such areas must be compatible with the continuance of the latter (§ 30240, subd. (b)). Of equal significance, the Commission must implement the public access policies of the act in a manner taking into account the topo-

graphic characteristics. of the site, "[t]he capacity of the site to sustain use and at what level of intensity," and "[t]he appropriateness of limiting public access ... depending on ... the fragility of the natural resources in the area ...." (§ 30214, subds. (a)(1), (2), and (3).)

## II

██ The City next urges the Commission's finding the project would prejudice the ability of the local government to prepare a local coastal program is not supported by substantial evidence.[3]

Section 30004, subdivision (a), declares the legislative finding that "[t]o achieve maximum responsiveness to local conditions, accountability, and public accessibility, it is necessary to rely heavily on local government and local land use planning procedures and enforcement." Consequently, the act directs each local government lying wholly or partially within the coastal zone to prepare a local coastal program (LCP) for its portion of the zone. (§ 30500.) A LCP includes "... a local government's (a) land use plans, (b) zoning ordinances, (c) zoning district maps, and (d) within sensitive coastal resources areas, other implementing actions ..." necessary to effectuate the provisions and policies of the act. (§ 30108.6.) Upon completion, LCP's are to be reviewed by the regional coastal commissions and certified by the Commission (§ 30512), a process to be completed by July 1, 1981 (§ 30518). Before certification of a LCP, a coastal development permit shall not be issued unless it is found the proposed development is in conformity with the provisions of the act and will not prejudice the ability of the local government to prepare a LCP consistent with the act. (§ 30604, subd. (a).) However, the Legislature did not intend a moratorium on all developments until completion of each LCP, but rather a conscious balancing of the protection of coastal resources with development. (*Billings* v. *California Coastal Com., supra*, 103 Cal.App.3d 729, 745.)

Substantial evidence establishes that the development of the road in controversy, as well as its surrounding areas, constituted a significant is-

---

[3]The City's reliance upon the San Diego Coast Regional Commission's findings in its decision is misplaced. In light of the "de novo" review by the Commission of a case appealed from the regional commission (§ 30621), the latter's decision and accompanying findings are vacated and of no controlling precedential value. (Cf. *REA Enterprises* v. *California Coastal Zone Conservation Com.* (1975) 52 Cal.App.3d 596, 612-613 [125 Cal.Rptr. 201].)

sue in the LCP process. The EIR for the Carmel Valley Estates project stated that development of the project, including the section of the road in dispute, would prematurely determine land use in the area, potentially conflicting with provisions of the act. Specifically, it warned that the widening of the road could result in the filling of the lagoon. In complying with the LCP process for the Torrey Pines Community Planning Area, the City identified as a planning problem the proposition of increasing shoreline accessibility via Carmel Valley Road, while preventing encroachment in the lagoon, specifically noting the instant conflict. The City further identified as a significant issue the consideration of an areawide circulation plan as it affects the road, directing thought to be given to minimizing it as a major east-west link and reserving its use to mainly recreational purposes in order to avoid adversely affecting the ecologically important wetlands. This same consideration was stressed within the preliminary work on the nearby North City West Community Planning Area. Indeed, the importance of addressing these issues of the protection of the lagoon and the development of an areawide circulation plan, which would minimize traffic impacts upon Carmel Valley Road, in the City's LCP was recognized by the Commission's staff in January 1979, when reviewing the pivotal issues of the Torrey Pines Community Plan.

There appears to be an inherent inconsistency between the City's efforts to participate in the LCP process and its attempt to proceed to alter Carmel Valley Road before that process has been completed. The City's policy is to set road design standards on the basis of anticipated traffic for the next 20 years. For the project in dispute, its projections were predicated upon the assumption Carmel Valley Road would be developed as a major east-west transportation link within a substantial industrial development along Sorrento Valley Road. However, after the Commission's adoption of the North City West Plan issue identification, its staff has worked directly with the developers within the area and believes the transportation network plans for the area will be modified to eliminate any reliance upon Carmel Valley Road as a major east-west route. Consequently, since the selection of road width depends upon land use expectations, traffic generation and circulation data, which are subject to modification during the LCP process, the Commission acted properly in deferring a decision widening the road at the expense of altering the lagoon. Indeed, approval of piecemeal coastal development projects potentially designed to bootstrap particular future land uses within the LCP serves to defeat not only the goals of the Act, but more specifically the unhampered nature of the LCP process.

## III

■ The City finally asserts the Commission's finding the proposed project "would have a significant adverse impact on the environment within the meaning of the California Environmental Quality Act and feasible alternatives exist which would substantially reduce these adverse impacts" is not supported by substantial evidence.[4]

Our earlier discussion clearly establishes the substantiality of the evidence regarding the significant adverse environmental impact upon the lagoon of the filling accompanying the construction of the proposed project. There is further substantial evidence of the existence of feasible alternatives to the project. First, in attempting to determine a safer alignment of the roadway than the existing radius of 350 feet which would not necessitate massive grading or encroachment into the lagoon, the Commission staff proposed cutting into the bluff, thus eliminating the reverse curve without widening the roadway. Second, the Carmel Valley Estates EIR noted the alternative of widening the north side of the road so that a right turn lane would be created on Carmel Valley Road to northbound Portofino Drive, without cutting into the bluff. Third, the greater use of other routes, such as Del Mar Heights Road and Villa de la Valle to the north and Genesee Avenue to the south of Carmel Valley Road, constitutes another feasible alternative, as those routes could be widened to improve coastal access without negatively affecting coastal wetlands or endangered species.[5]

---

[4]The City's proposals throughout the proceedings have involved a minimum pavement width of over 50 feet plus shoulder space, although the minimum lane for multilane rural highways is 11 feet. The City's intent is to avoid any regrading in the future when a four-lane road is constructed. However, the City's presumption of this need is predicated not only upon a traffic burden potentially not consistent with the LCP (*supra*), but upon inaccurate traffic counts of current road use. The City argued that the peak daily use of 8,900 trips per day exceeds the City's standards of 5,000 trips per day requiring upgrading. However, actual traffic metering establishes peak-hour traffic ranges from 510 to 800 trips, in both directions. Peak-hour capacity determines actual capacity of a highway, not total daily trips.

[5]In light of our finding of substantial evidence supporting feasible alternatives to the proposed project, it is unnecessary for us to discuss the City's contention the Commission's criticism of the inadequacy of the Carmel Valley Estates Project EIR for review of the project at bench was improper. We note, however, communication between the parties produced supplemental discussion regarding feasible alternatives to the project; but that discussion combined with an EIR, focusing primarily upon the impact of a housing project on the environment and not the instant road alteration, appears to be less detailed than necessary to accomplish the purposes of the administrative inquiry.

*Disposition*

The judgment is affirmed.

Cologne, Acting P. J., and Work, J., concurred.

On June 5, 1981, the opinion was modified to read as printed above.