[Civ. No. 26584. Fourth Dist., Div. One. July 2, 1982.]

CITY OF CHULA VISTA, Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
CALIFORNIA COASTAL COMMISSION, Real Party in Interest.

474

**COUNSEL**

Ronald A. Zumbrum, Harold J. Hughes, Thomas E. Hookano, Elleene A. Kirkland, Clifton E. Reed, Hillyer & Irwin and Howard E. Susman for Petitioner.

Thomas I. McKnew, Jr., and R. Curtis Ballantyne as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

George Deukmejian, Attorney General, N. Gregory Taylor, Assistant Attorney General, and Anthony M. Summers, Deputy Attorney General for Real Party in Interest.

OPINION

COLOGNE, J.—This petition for extraordinary relief arises out of a dispute between the California Coastal Commission (Commission) and the City of Chula Vista (City) concerning the proper application of the California Coastal Act of 1976 (Coastal Act or Act) (Pub. Resources Code,[1] § 30000 et seq.) in the context of the Commission's refusal to approve City's Local Coastal Program (LCP) outlining future development plans for part of south San Diego Bay. The petition was filed originally in the California Supreme Court on account of the great public importance of the issues and the need for a uniform statewide resolution, but the high court has transferred it here. We have issued our alternative writ.

The procedural history of the matter may be outlined as follows: In the early 1970's before the present Coastal Act was passed, the City acting jointly with the San Diego Unified Port District formulated a development plan for its bayfront known as the Bayfront Redevelopment Plan, formally adopted in 1974. Then the Coastal Act was enacted, requiring each local government lying within the coastal zone to prepare a "local coastal program" for its portion of the coastal area (§ 30500, subd. (a)).[2] A local coastal program is defined as a package of land use

---

[1] All statutory references are to the Public Resources Code unless otherwise specified.

[2] Section 30500, subdivision (a) reads: "Each local government lying, in whole or in part, within the coastal zone shall prepare a local coastal program for that portion of the coastal zone within its jurisdiction. However, any such local government may request, in writing, the commission to prepare a local coastal program, or a portion thereof for the local government. Each local coastal program prepared pursuant to this chapter shall contain a specific public access component to assure that maximum public access to the coast and public recreation areas is provided." (Stats. 1981, ch. 1173.)

plans, zoning ordinances, zoning district maps, and, within sensitive coastal resource areas, other implementing actions which satisfy the policies and restrictions of the Coastal Act (§ 30108.6). The City re-shaped its Bayfront Redevelopment Plan in light of the Coastal Act policies and requirements and submitted it for approval to the Commis-sion in accordance with statutory requirements on February 2, 1979. On May 4, 1979, the regional commission suggested extensive revisions and amendments to City's LCP and approved the program conditioned upon such revisions. The plan with the regional commission's recom-mendations was submitted for further review to the Commission, and City objected to the revisions before the statewide Commission. How-ever, after extensive hearings, the state Commission on September 18, 1979, adopted some of the proposed findings of the regional commission and granted conditional approval of the LCP.

City then commenced judicial review procedures by filing a petition for administrative mandate review (Code Civ. Proc., § 1094.5) in the superior court on November 16, 1979. After extensive hearings and re-view of the administrative transcript, the superior court rendered its peremptory writ of mandate on March 5, 1981, remanding the matter to the Commission with directions to withdraw the conditional certifica-tion because the Commission has no conditional approval power and must either approve or disapprove the LCP. The Commission then held further hearings, withdrew its approval, and filed its return to the pe-remptory writ May 5, 1981, setting out what it had done. Over City's objections, the court discharged the writ but granted City leave to file a supplemental petition for review, which it did on June 22, 1981, again under Code of Civil Procedure section 1094.5.

The supplemental petition forms the basis for this proceeding. It charges the Commission acted improperly in a number of ways: (1) it used an improper review standard exercising its independent judgment rather than deferring to City's legislative power; (2) it improperly found various areas to be "sensitive environments," "marine habitats," or other categories of land worthy of special protection; (3) it did not observe the special permission of the Coastal Act for development in "already developed parts of South San Diego Bay."

After hearings on the supplemental petition beginning September 21, 1981, the superior court entered formal judgment in favor of the Com-mission. It found the Commission may exercise its independent judg-ment in deciding whether an LCP conforms to the statewide policies of

the Coastal Act; its approval or refusal to approve an LCP is reviewable in the superior court under Code of Civil Procedure section 1094.5 according to the substantial evidence test of review; and here the Commission's findings and order are supported by substantial evidence. Accordingly, the final judgment dated November 16, 1981, denied City the writ of mandate.

City sought extraordinary relief by way of a writ of mandate. Although conceding the appealability of the superior court judgment, City contended the great public importance of the issues calls for immediate relief.

In its response to the petition, the Commission did not oppose issuance of a prerogative writ. However, it stated there is a rising tide of litigation which threatens to interfere with coastal planning. For these reasons we have issued an alternative writ to settle the important legal issues raised in this and similar cases (see, e.g., *State of California* v. *Superior Court* (*Veta Company*) (1974) 12 Cal.3d 237 [115 Cal.Rptr. 497, 524 P.2d 1281]).

SUMMARY OF FACTS

To facilitate understanding, the basic facts will be summarized before stating the contentions of the parties. City's coastal zone is bounded by Interstate 5 on the east, San Diego Bay on the west, the corporate boundary with National City to the north, and the San Diego city boundary to the south. The distinctive features of the area are the Sweetwater Marsh complex, Gunpowder Point, the "D" Street fill, and the Vener farm and marsh. The Sweetwater Marsh is a complex of healthy tidal marshlands supporting a wide variety of wildlife. Gunpowder Point is a 40-acre upland area next to the bay and the marsh which is the site of an abandoned and decaying munitions factory.

The "D" Street fill is a 90-acre upland north of the Sweetwater River Channel which was created by the dredging of the 24th Street Channel. It lies partly within the jurisdiction of the San Diego Unified Port District. A portion is nesting grounds for the California least tern, an endangered species.

The Vener farm area is an undeveloped area including some wetlands east of the marsh complex and west of Interstate 5. This area and the

Sweetwater Marsh area are admittedly places which contain significant biological resources entitled to special protection and enhancement.

## CONTENTIONS OF THE PARTIES

As stated above, the superior court found substantial evidence supports the Commission's reasons for disapproving part of the City's LCP, and further found the Commission was entitled to exercise its independent judgment in deciding whether the LCP conformed to coastal policies. The court also determined the test of judicial review to be whether substantial evidence supported the Commission's findings under Code of Civil Procedure section 1094.5 (which is made specifically applicable to review of the Commission's findings, § 30801).

The Commission quarrels with only one ruling, namely, the scope of judicial review of Commission procedures. Commission contends it acts in a quasi-legislative capacity, rather than a quasi-judicial manner when it approves or disapproves an LCP, and that such quasi-legislative administrative adjudications are not subject to substantial evidence review under Code of Civil Procedure section 1094.5, but can only be challenged by traditional writ of mandate (Code Civ. Proc., § 1085) on the basis of being arbitrary, capricious or lacking in evidentiary support.

The City's contentions are more numerous. First, it contends its legislative activity in drawing up the LCP cannot be challenged by Commission except on the basis of being completely arbitrary, capricious, or lacking in evidentiary support. Drawing upon a statement on the scope of judicial review of Industrial Welfare Commission action in *California Hotel & Motel Assn.* v. *Industrial Welfare Com.* (1979) 25 Cal.3d 200, at page 212 [157 Cal.Rptr. 840, 599 P.2d 31], City contends the scope of Commission review should be: "The Commission must ensure that the local government has adequately considered all relevant factors and has demonstrated a rational connection between those factors, the provisions of its local coastal program, and the policies of the Coastal Act." City suggests the Commission must be satisfied that statewide interests were balanced against local interests, and environmental concerns against economic concerns, but it cannot upset the balance struck by the local government unless that balance is irrational. Any other scope of review, City argues, invades its function as the primary land use planner, specifically designated by section 30500, subdivision (c), to formulate the details of the LCP under the code language stating,

"[t]he precise content of each local coastal program shall be determined by the local government ... in full consultation with the commission and with full public participation." (Stats. 1981, ch. 1173.)

City further contends the Commission has invaded City's province and has made incorrect decisions in these specific respects: (1) Gunpowder Point is misdescribed as an environmentally sensitive habitat area per sections 30107.5 and 30240, when it is a degraded area which is adjacent to a sensitive habitat; (2) similarly, both Gunpowder Point and the "D" Street fill are mischaracterized as entitled to protection as marine resources or biologically productive wetlands (§§ 30230, 30231), although they are land environments; (3) the Commission has misapplied section 30233, subdivision (c), regulating diking, filling and dredging in wetlands, to the proposed extension of Tidelands Avenue and the Gunpowder Point access road, despite specific authorization in the statute for development of already developed parts of south San Diego Bay.

## I. THE STATUTES

The Coastal Act begins with lengthy and detailed recitations of the legislative goals in sections 30001, 30001.5 and 30004, all set out in full in the margin.[3] The Legislature, among other things, declares the need to protect the distinct and valuable natural resources which is the California coastal zone; states planned development of this area is essential to the economic and social welfare of the People of this state; advocates protection, maintenance and balanced development of the coastal zone environment with its natural and manmade resources and features; seeks to maximize public access to the coast consistent with sound resources conservation and with constitutional protection of the rights of private property owners in the vicinity; seeks to encourage local as well as state initiative and cooperation in planning coastal use; and finally, to achieve maximum responsiveness to local conditions, states the necessity to rely heavily on local government and local land use planning procedures and enforcement while yet providing maximum state involvement in federal activities, protecting regional, state and national interests and coordinating the many agencies whose activities affect the coastal zone, all to be achieved by provision for the Commission to insure continued state coastal planning and management.

---

[3]Section 30001: "The Legislature hereby finds and declares:
"(a) That the California coastal zone is a distinct and valuable natural resource of

Clearly, the statutory mandate is a large order. The goals are manifold and the potential for conflict among agencies, property owners and the Commission is great. A most important aim, however, is to insure statewide supervision over coastal zone development, to avoid local pressures having an undue impact upon the planning for this unique and irreplaceable resource; hence, the creation of the statewide agency.

---

vital and enduring interest to all the people and exists as a delicately balanced ecosystem.

"(b) That the permanent protection of the state's natural and scenic resources is a paramount concern to present and future residents of the state and nation.

"(c) That to promote the public safety, health, and welfare, and to protect public and private property, wildlife, marine fisheries, and other ocean resources, and the natural environment, it is necessary to protect the ecological balance of the coastal zone and prevent its deterioration and destruction.

"(d) That existing developed uses, and future developments that are carefully planned and developed consistent with the policies of this division, are essential to the economic and social well-being of the people of this state and especially to working persons employed within the coastal zone."

Section 30001.5: "The Legislature further finds and declares that the basic goals of the state for the coastal zone are to:

"(a) Protect, maintain, and, where feasible, enhance and restore the overall quality of the coastal zone environment and its natural and manmade resources.

"(b) Assure orderly, balanced utilization and conservation of coastal zone resources taking into account the social and economic needs of the people of the state.

"(c) Maximize public access to and along the coast and maximize public recreational opportunities in the coastal zone consistent with sound resources conservation principles and constitutionally protected rights of private property owners.

"(d) Assure priority for coastal-dependent and coastal-related development over other development on the coast.

"(e) Encourage state and local initiatives and cooperation in preparing procedures to implement coordinated planning and development for mutually beneficial uses, including educational uses, in the coastal zone."

Section 30004: "The Legislature further finds and declares . . . :

"(a) To achieve maximum responsiveness to local conditions, accountability, and public accessibility, it is necessary to rely heavily on local government and local land use planning procedures and enforcement.

"(b) To ensure conformity with the provisions of this division, and to provide maximum state involvement in federal activities allowable under federal law or regulations or the United States Constitution which affect California's coastal resources, to protect regional, state, and national interests in assuring the maintenance of the long-term productivity and economic vitality of coastal resources necessary for the well-being of the people of the state, and to avoid long-term costs to the public and a diminished quality of life resulting from the misuse of coastal resources, to coordinate and integrate the activities of the many agencies whose activities impact the coastal zone, and to supplement their activities in matters not properly within the jurisdiction of any existing agency, it is necessary to provide for continued state coastal planning and management through a state coastal commission."

Under section 30512.2, subdivision (b), the Legislature appears to have limited the Commission's function in reviewing the land use plan aspect of an LCP to achieving the basic state goals specified in section 30001.5 (Stats. 1981, ch. 1173).

The goals, so far as relevant here, are made more specific in a number of provisions of the Act. For example, "environmentally sensitive areas" are defined in section 30107.5[4] as regions where the plant or animal life is particularly rare or valuable and particularly vulnerable to degradation by human activities. Section 30240[5] states environmentally sensitive habitat areas "shall be protected" against significant disruption, a protection which includes certain regulation of development in adjacent areas also.

Sections 30230 through 30236, comprising the article entitled "Marine Environment," similarly state the special protection to be afforded marine resources, areas and species of special biological or economic significance.[6]

Section 30231[7] states the mandatory goal of maintaining biological productivity and quality of coastal waters, streams, wetlands, estuaries and lakes to maintain optimum populations of marine organisms and for protection of human health, through such means as controlling waste and water runoff, preventing interference with surface water flow, providing buffer areas of natural vegetation, and minimizing alteration of natural streams.

[4]Section 30107.5: "'Environmentally sensitive area' means any area in which plant or animal life or their habitats are either rare or especially valuable because of their special nature or role in an ecosystem and which could be easily disturbed or degraded by human activities and developments."

[5]Section 30240: "(a) Environmentally sensitive habitat areas shall be protected against any significant disruption of habitat values, and only uses dependent on such resources shall be allowed within such areas.

"(b) Development in areas adjacent to environmentally sensitive habitat areas and parks and recreation areas shall be sited and designed to prevent impacts which would significantly degrade such areas, and shall be compatible with the continuance of such habitat areas."

[6]Section 30230: "Marine resources shall be maintained, enhanced, and, where feasible, restored. Special protection shall be given to areas and species of special biological or economic significance. Uses of the marine environment shall be carried out in a manner that will sustain the biological productivity of coastal waters and that will maintain healthy populations of all species of marine organisms adequate for long-term commercial, recreational, scientific, and educational purposes."

[7]Section 30231: "The biological productivity and the quality of coastal waters, streams, wetlands, estuaries, and lakes appropriate to maintain optimum populations of marine organisms and for the protection of human health shall be maintained and, where feasible, restored through, among other means, minimizing adverse effects of waste water discharges and entrainment, controlling runoff, preventing depletion of ground water supplies and substantial interference with surface water flow, encouraging waste water reclamation, maintaining natural vegetation buffer areas that protect riparian habitats, and minimizing alteration of natural streams."

Finally, section 30233[8] states special rules for diking, filling and dredging operations in coastal waters, wetlands, estuaries and lakes. Such operations are permitted only when there is no feasible less environmentally damaging alternative and are limited to stated purposes, principally coastal related industrial facilities, including commercial fishing operations, maintenance or restoration of existing boating facilities, limited new or expanded boating facilities, and other stated uses. The permitted reasons for diking, filling, or dredging do not specifically include public recreational facilities other than "very minor incidental public facilities" and "development in already developed parts of south San Diego Bay, if otherwise in accordance with this division." (Other exceptions are not here pertinent.)

---

[8]Section 30233: "(a) The diking, filling, or dredging of open coastal waters, wetlands, estuaries, and lakes shall be permitted in accordance with other applicable provisions of this division, where there is no feasible less environmentally damaging alternative, and where feasible mitigation measures have been provided to minimize adverse environmental effects, and shall be limited to the following:

"(1) New or expanded port, energy, and coastal-dependent industrial facilities, including commercial fishing facilities. [¶] (2) Maintaining existing, or restoring previously dredged, depths in existing navigational channels, turning basins, vessel berthing and mooring areas, and boat launching ramps. [¶] (3) In wetland areas only, entrance channels for new or expanded boating facilities; and in a degraded wetland, identified by the Department of Fish and Game pursuant to subdivision (b) of Section 30411, for boating facilities if, in conjunction with such boating facilities, a substantial portion of the degraded wetland is restored and maintained as a biologically productive wetland; provided, however, that in no event shall the size of the wetland area used for such boating facility, including berthing space, turning basins, necessary navigation channels, and any necessary support service facilities, be greater than 25 percent of the total wetland area to be restored. [¶] (4) In open coastal waters, other than wetlands, including streams, estuaries, and lakes, new or expanded boating facilities. [¶] (5) Incidental public service purposes, including, but not limited to, burying cables and pipes or inspection of piers and maintenance of existing intake and outfall lines. [¶] (6) Mineral extraction, including sand for restoring beaches, except in environmentally sensitive areas. [¶] (7) Restoration purposes. [¶] (8) Nature study, aquaculture, or similar resource-dependent activities.

"(b) Dredging and spoils disposal shall be planned and carried out to avoid significant disruption to marine and wildlife habitats and water circulation. Dredge spoils suitable for beach replenishment should be transported for such purposes to appropriate beaches or into suitable longshore current systems.

"(c) In addition to the other provisions of this section, diking, filling, or dredging in existing estuaries and wetlands shall maintain or enhance the functional capacity of the wetland or estuary. Any alteration of coastal wetlands identified by the Department of Fish and Game, including, but not limited to, the 19 coastal wetlands identified in its report entitled, 'Acquisition Priorities for the Coastal Wetlands of California', shall be limited to very minor incidental public facilities, restorative measures, nature study, commercial fishing facilities in Bodega Bay, and development in already developed parts of south San Diego Bay, if otherwise in accordance with this division.

"For the purposes of this section, 'commercial fishing facilities in Bodega Bay' means that no less than 80 percent of all boating facilities proposed to be developed or im-

The Coastal Act also provides procedures for formulation and review of planned coastal development. The local government is designated to prepare the local coastal program, meaning the combination of land use plans, zoning ordinances, zoning maps and other implementing actions which meet the requirements and implement the policies of the Act. (See § 30108.6 defining local coastal program, and § 30500 designating the local government to determine the precise content of such programs.)[9]

Chapter 6 of the Act then provides procedures for the approval and certification of local programs by the Commission. Section 30510 et seq. provides for statewide review of local programs, within stated time limits and allowing for public hearings at various stages of the procedures.

Finally, section 30801[10] provides any aggrieved person may secure judicial review of Commission action by a petition for writ of mandate in accordance with Code of Civil Procedure section 1094.5. The pertinent procedural statutes are not quoted here in full because the parties do not challenge any procedural aspects of what has transpired to date.

proved, where such improvement would create additional berths in Bodega Bay, shall be designed and used for commercial fishing activities." (As amended by Stats. 1978, ch. 673; see now § as amended by Stats. 1982, ch. 43, urgency, eff. 2/17/82.)

[9]Section 30108.6: "'Local coastal program' means a local government's (a) land use plans, (b) zoning ordinances, (c) zoning district maps, and (d) within sensitive coastal resources areas, other implementing actions, which, when taken together, meet the requirements of, and implement the provisions and policies of, this division at the local level."

Section 30500: "(a) Each local government lying, in whole or in part, within the coastal zone shall prepare a local coastal program for that portion of the coastal zone within its jurisdiction. However, any such local government may request, in writing, the commission to prepare a local coastal program, or a portion thereof for the local government. Each local coastal program prepared pursuant to this chapter shall contain a specific public access component to assure that maximum public access to the coast and public recreation areas is provided.

"(b) Amendments to a local general plan for the purpose of developing a certified local coastal program shall not constitute an amendment of a general plan for purposes of Section 65361 of the Government Code.

"(c) The precise content of each local coastal program shall be determined by the local government, consistent with Section 30501, in full consultation with the commission and with full public participation." (Stats. 1981, ch. 1173.)

[10]Section 30801: "Any aggrieved person shall have a right to judicial review of any decision or action of the commission or a regional commission by filing a petition for a writ of mandate in accordance with the provisions of Section 1094.5 of the Code of Civil Procedure, within 60 days after such decision or action has become final.

"For purposes of this section and subdivision (c) of Section 30513 and Section 30625, an 'aggrieved person' means any person who, in person or through a representa-

## II. The Standard of Review

### A. Judicial Review

It is critical to determine at the outset whether substantial evidence review is mandated, as the trial court held, or whether instead, as Commission now argues, its actions may only be reviewed in the limited manner we review legislative enactments where fundamental constitutional rights are not implicated.

The trial court's choice of the substantial evidence review standard is bottomed on section 30801, which expressly makes review under Code of Civil Procedure section 1094.5 applicable to Commission action. ■ Traditionally, section 1094.5 review is a procedure for reviewing quasi-judicial administrative rulings. The review standard may be either substantial evidence (as here, where fundamental rights are not implicated), or independent judgment, but in either event it is a far more searching scrutiny than review of legislative activity. The latter review traditionally proceeds by way of extraordinary writ of mandate and is limited (again in the absence of constitutional implications) to the inquiry whether the agency acted within the scope of its delegated authority; whether it used fair procedures; and whether its action was reasonable as opposed to being arbitrary, capricious, or lacking in evidentiary support (*California Hotel & Motel Assn.* v. *Industrial Welfare Com., supra,* 25 Cal.3d 200, 211 et seq.; *Santa Ana Tustin Community Hospital* v. *Board of Supervisors* (1982) 127 Cal.App.3d 644, 653 [179 Cal.Rptr. 620]). Judicial review of quasi-legislative activity minimizes judicial interference in the interests of the separation of powers doctrine and defers greatly to the power of the quasi-legislative agency (see *Industrial Welfare Com.* v. *Superior Court* (1980) 27 Cal. 3d 690, 702 [166 Cal.Rptr. 331, 613 P.2d 579]).

The reference to Code of Civil Procedure section 1094.5 in the Act cannot be determinative of the issue whether the Commission acts in a quasi-judicial or quasi-legislative capacity when it rules on an LCP.

---

tive, appeared at a public hearing of the commission, regional commission, local government, or port governing body in connection with the decision or action appealed, or who, by other appropriate means prior to a hearing, informed the commission, regional commission, local government, or port governing body of the nature of his concerns or who for good cause was unable to do either. 'Aggrieved person' includes the applicant for a permit and, in the case of an approval of a local coastal program, the local government involved."

Otherwise, the mere labeling of the review process would characterize the underlying function. There is no authority for the proposition that citing section 1094.5 as the review procedure automatically characterizes an administration function as quasi-judicial. Further, cases in the administrative law area routinely examine the nature of the administrative function reviewed to determine the proper scope of review. The cases above cited are examples.

At best, the reference to Code of Civil Procedure section 1094.5 is some evidence of legislative intent. It is very weak evidence, however. The issue whether a function is legislative or judicial is sufficiently complex to baffle the most sophisticated courts which routinely must deal with the issue, and it is unlikely to have been analyzed by the Legislature and memorialized in offhand fashion by the use of the statutory reference. More likely, the Legislature intended to provide for judicial review, did not consider it within its province to determine the nature of that review and referred to section 1094.5 because it is the only statute directly providing for review of administrative action. The parties provide no legislative history to the contrary.[11]

More important, however, it is essentially a judicial function to determine the scope of judicial review. We must determine on rational grounds, dealing with the essential nature of the function we review, whether it is legislative or judicial; whether it involves fundamental rights; and following from these determinations, what extent of review is authorized. It is unclear whether the trial court has engaged in this process, but we must in any event make our independent determination of this threshold question of law.

The certification of an LCP has attributes of both kinds of functions. The approval of what is essentially a land planning or zoning package is like the indisputably legislative function of enacting zoning ordinances, in that the result of the process will be promulgation of general develop-

---

[11]In a recent enactment, effective January 1, 1982, of which we are mindful in making this analysis, the Legislature characterizes the Commission's review of a land use plan as an "administrative determination." Section 30512.2, subdivision (a) reads: "The following provisions shall apply to the commission's decision to certify or refuse certification of a land use plan pursuant to Section 30512: [¶] (a) The commission's review of a land use plan shall be limited to its administrative determination that the land use plan submitted by the local government does, or does not, conform with the requirements of Chapter 3 (commencing with Section 30200). In making this review, the commission is not authorized by any provision of this division to diminish or abridge the authority of a local government to adopt and establish, by ordinance, the precise content of its land use plan." (Stats. 1981, ch. 1173.)

ment criteria and land use regulations for a large physical area affecting many members of the public. However, it is also like a judicial function in that general criteria, namely, the statewide standards of the Act, are applied to an individual instance, the LCP in question, to make an individual determination of conformance or nonconformance. This aspect of the function resembles the variance procedure, quasi-judicial, involving application of a general law to special facts. Also, the procedures mandated by the Act share common features with judicial processes, such as the holding of hearings, taking of testimony, to adjudicate individual issues; but also are like legislative processes in that the Commission also gathers evidence independently, formulates general standards from this evidence, employs its own experts, considers external facts not brought before it by the parties.

The local coastal program documents serve essentially the same function as a general plan, even requiring conformity of later zoning ordinances with the plan (§ 30513). ■ Adoption or amendment of a general plan is legislative or quasi-legislative (*Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 118 [109 Cal.Rptr. 799, 514 P.2d 111]; *Karlson* v. *City of Camarillo* (1980) 100 Cal.App.3d 789, 799 [161 Cal.Rptr. 260]; *Mountain Defense League* v. *Board of Supervisors* (1977) 65 Cal.App.3d 723 [135 Cal.Rptr. 588]; *Dale* v. *City of Mountain View* (1976) 55 Cal.App.3d 101, 107-108 [127 Cal. Rptr. 520]).

■ Both general plans regulating land use and local coastal programs under the Coastal Act set rules to be applied to future cases, unlike adjudicatory functions which apply such rules to specific sets of existing facts (*Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34-35, fn. 2 [112 Cal.Rptr. 805, 520 P.2d 29]; *Santa Ana Tustin Community Hospital, supra*, 127 Cal.App.3d 644, 652). Also, the local coastal program normally includes both a land use plan and implementing zone ordinances (§ 30108.6).

The case of *Davis* v. *California Coastal Zone Conservation Com.* (1976) 57 Cal.App.3d 700, 706-707 [129 Cal.Rptr. 417] found a regional commission's function of approving development permits to be a quasi-judicial function, reviewed by substantial evidence standards. *Davis* gives a thorough review of administrative review cases falling into both categories, but does not specifiy the precise basis for its own ruling.

A case recently addressing the scope of review of activity of the Commission is this court's decision in *City of San Diego* v. *California Coastal Com.* (1981) 119 Cal.App.3d 228 [174 Cal.Rptr. 5]. There we reviewed the Commission's denial of a permit to realign and widen a portion of a road adjacent to a coastal wetlands lagoon (Los Penasquitos Lagoon) by the substantial evidence review standard. The opinion states the parties agreed the matter is governed by the substantial evidence test (119 Cal.App.3d at p. 232) and there is therefore no discussion nor analysis of the suitability of that standard of review. The case is consistent, however, with *Davis, supra* (57 Cal.App.3d 700), dealing with grant or denial of a permit as a quasi-judicial function.

Most significant for our purposes, however, we note the Commission in approving or disapproving an LCP does not create or originate any land use rules and regulations. It can approve or disapprove but it cannot itself draft any part of the coastal plan. In that respect the Commission's review function sharply differs from the role of a legislative body and more nearly resembles the adjudicatory task.

We conclude when the Commission reviews an LCP for conformity to statewide standards it performs a predominantly judicial rather than legislative function. The standard of judicial review of its action is therefore the substantial evidence test, which we must apply as did the trial court, to determine whether any credible evidence supports the Commission's decision not to certify Chula Vista's LCP.

### B. Standard for the Commission's Review of the LCP

■ The City has argued Commission has no legislative power and can therefore review the legislative action of City only by the standard of whether it is arbitrary or capricious. City's argument is twofold: First, the Act commits to City the task of drawing the specific details of the plan. Second, the legislative history shows intent to involve local government deeply in the planning process and to charge local entities with the primary land planning function. However, neither of these arguments is determinative. The fact that the planning power belongs to the City in part does not preclude the Commission also having coordinate powers at a later stage in the procedure. The construct of shared legislative powers between different agencies may not make for swift and smooth rule making, but it is not inherently impossible. The fact City is the first agency to work on the plan is not determinative of the

scope of Commission's powers. By comparison, the scope of the WCAB's judicial power is not limited because a hearing officer must first rule on each case. The Board is the ultimate fact finder and judge; so also the Commission may be the ultimate decision maker, quite consistently with the concept of City's initiatory role. A cursory examination of the statements of legislative goals embodied in section 30001.5 (see fn. 3, *supra*) makes this point plain. Local government is to be included, but statewide standards are to be formulated; local government plans, but a statewide commission reviews. Surely the Legislature did not go to all this trouble to create a statewide rubber stamp agency which does no more than review local legislation for arbitrary and capricious enactments. Rather, it is assumed statewide interests are not always well represented at the local level,[12] and therefore, an agency is needed which promulgates statewide rules and statewide policies.

The City argues if its function is legislative, the Commission may not exercise independent judgment in reviewing it. This argument does not depend on the classification of Commission's function. It has no merit in any case. The courts are limited by separation of powers doctrine in the way they review legislative decisions, but no such limit binds the review power of a separate agency created by the Legislature, here the Commission. As already stated, the entire scheme of the Act provides for the initial planning to be done locally and the final approval to be done by a statewide agency with an eye to statewide policies and limitations. The function of the statewide agency would be trivial and its existence unjustifiable if its function were purely to review City's action for rationality, for conceivable conformity to the state standards rather than actual compliance. Clearly, the Commission must exercise its independent judgment to decide if such conformity has been achieved because that decision cannot be completely delegated to the local entity where it is likely to be subject to local economic and political pressures which cannot so readily influence the Commission.

The situation is analogous to the case of *Dorcich v. Johnson* (1980) 110 Cal.App.3d 487 [167 Cal.Rptr. 897], involving the scope of discretion conferred on a statewide agency enforcing the Williamson Act to protect agricultural land and discourage premature urban uses (Gov. Code, § 51200 et seq.). The Act here is in many respects like the Wil-

---

[12]Cf. *CEEED v. California Coastal Zone Conservation Com.* (1974) 43 Cal.App.3d 306, 322 [118 Cal.Rptr. 315]: "Resolution of the environmental and ecological problems arising out of the competing and conflicting demands made upon the use and enjoyment of the California shoreline has proven to be beyond the capabilities of local governmental agencies."

liamson Act—designed to discourage premature urban uses in the coastal zone except in compliance with statewide standards.[13] In *Dorcich, supra*, the court found the power of "approval" given the agency included the idea of discretion or adjudication, and that the statewide agency (Secretary) must exercise its independent judgment in making that determination (see modification of opn. on den. of rehg., 111 Cal. App.3d 476c). The same principles apply here. City's "separation of powers" argument is unconvincing.

We conclude the Commission must exercise its independent judgment when reviewing the LCP.

### III. WHETHER SUBSTANTIAL EVIDENCE SUPPORTS THE COMMISSION FINDINGS

As stated above, the City contends the evidence is insufficient to establish these Commission findings: (1) Gunpowder Point is an environmentally sensitive habitat area; (2) Gunpowder Point and the "D" Street fill are marine areas or wetlands; (3) the extension of Tidelands Avenue across Sweetwater Marsh and the improvement of the southern dike to Gunpowder Point constitute impermissible diking, filling and road construction in a protected marsh, rather than permitted activity in an already developed part of the bay. City's focus on whether the affected areas correspond to particular categories in the various statutes does not resolve the basic issue whether the Commission could refuse to approve City's LCP. The statutes do not cause overall approval of an LCP to turn on whether a specific area targeted for development is, or is not, a sensitive habitat, a marine environment, or whatever. The statutes taken together protect "areas and species of special biological or economic significance" (§ 30230). Thus when development of any given region is contemplated, the question is the effect that development will probably have upon areas and species worthy of special protection. Here, there is no dispute that the Sweetwater Marsh complex is itself worthy of the very highest protection as one of the few remaining natural coastal marshlands in south San Diego Bay and, in fact, in all of coastal California, as an area of enormous biological productivity, nursery ground for many species of fish, home of at least 109 species of birds including such endangered species as the California least tern, the

---

[13]The Coastal Act deals also with preservation of agricultural land (§§ 30241-30243). Statutes should be construed in harmony with other enactments relating to the same general subject (*Clinton v. County of Santa Cruz* (1981) 119 Cal. App.3d 927, 933-934 [174 Cal.Rptr. 296]).

California brown pelican, the light-footed clapper rail, the black rail and the Belding's Savannah sparrow, all species which are endangered because man has destroyed or significantly impacted their habitats.

Thus, the Commission has found, undisputed by City, that "in view of the tremendous destruction of marsh habitat which has already occurred both in Sweetwater Marsh and the rest of San Diego Bay, and in view of the rarity and value of the habitats areas which are contained within the complex, that protection of the remaining wetlands in the Sweetwater Marsh Complex is of critical statewide and national importance to the preservation of wildlife." City not only does not disagree with this finding but has all along attempted in designing its LCP to accommodate these values by protecting the marshland in various ways, as by the use of buffer zones around development, the provision of special sites for bird nesting, the design of the proposed Tidelands Avenue extension so that it slopes and drains toward the bay rather than the marsh, and like mitigating measures. The Commission, however, has found that more protection and less intensive development is necessary. The issue is whether substantial evidence in the record supports that conclusion.

The Commission findings are based mainly on the letters and reports of biologists and ecologists. ■ (Opinion evidence of experts in environmental planning or ecological sciences is a permissible basis for decision. See, e.g., *City of San Diego v. California Coastal Com., supra,* 119 Cal.App.3d 228, 232; *Coastal Southwest Dev. Corp. v. California Coastal Zone Conservation Com.* (1976) 55 Cal.App.3d 525, 532 [127 Cal.Rptr. 775].) The evidence pertinent to disapproval of the City LCP may be summarized as follows:

(a) Gunpowder Point

Gunpowder Point is a 40-acre upland area entirely surrounded by marsh and mudflats and connected to the Vener farmland area by two dikes, more or less deteriorated. City contemplates a 700-unit hotel complex on the Point, with no vehicular access to the Point except for emergency and service vehicles over a road to be built on the southern dike. A sand beach is to be developed on the western end of the island next to mudflats along the bayshore. The Commission finds the construction of the improvements would degrade the marsh complex and eliminate open space and upland habitat which forms a vital part of the marsh ecosystem. The use of buffers around the development would

limit access of foot traffic but would not lessen the main impact of large buildings, construction and accompanying activity. Further, people and pets would have access from the proposed beach to the mudflat areas. The grading, filling, pile driving and other preconstruction activities would involve use of heavy equipment and could cause catastrophic increase in the amount of sediment reaching the wetlands. Noise levels could adversely affect the local wildlife. The permanent increase in levels of both noise and light resulting from the development could unfavorably impact such endangered species as the Belding's Savannah sparrow (which cannot mate when noise levels are high) and possibly other birds due to the imbalance of predation conditions caused particularly by excessive light. Gunpowder Point is an integral part of the marsh complex, although it is not itself a marsh. There is continuity of wetlands and adjacent uplands in a marsh complex and disturbance of one disturbs all.

City contended that in its present degraded state Gunpowder Point provides little benefit to the marsh. City argued that part of the Point is disturbed, previously urbanized area characterized by debris and litter, and part is under cultivation for truck farming. The open areas are dominated by adventitious weedy species rather than native marshland flora and fauna. The species using the Point are predominantly those associated with disturbed habitat such as rodents, rabbits, house finches, house sparrows, etc., and only the peripheral areas support such species as the great blue heron, Belding's Savannah sparrow and light-footed clapper rail, and these zones will be preserved intact by buffers in the proposed LCP. Further, the present agricultural uses drain into the adjoining marsh or pond areas harmful runoff contaminated by sedimentation from plowed fields and chemical pollutants from insecticides, pesticides and fertilizers. Also, domestic dogs and cats are present on the Point and are a predator hazard to nesting birds.

Commission responds in its findings that first, while the Belding's Savannah sparrow, an endangered species, was observed on the northwest margin of the Point on two instances, that fact does not establish it does not also forage elsewhere on the Point. There is insufficient evidence to conclude it is confined to the periphery. Further, according to biologists, the ecological approach requires preservation of the Point regardless of the presence or absence at any given time of marshland wildlife, because its value is in its role of maintaining the system as contiguous wildlife habitat. The upland habitat needs to be enhanced for further beneficial wildlife uses. Also, even in its present partly degraded condi-

tion, the Point provides open space and habitat value. Also, the fauna using the Point may play an integral part in the food web and ecological relationships which have developed in the marsh system; for example, herons and egrets feed on rodents, snakes and insects on the Point. Further, although the Commission agrees there is adverse sedimentary runoff contributed by present agricultural uses, construction activities usually generate tremendous sediment loads also.

The Commission concludes the protection of Gunpowder Point is essential to maintain the integrity of the Sweetwater Marsh complex. The construction of a major resort facility essentially surrounded by marsh and mudflat would not assure protection of these habitat values consistent with the policies of the Coastal Act.

(b) "D" Street Fill

The "D" Street fill is a large manmade landfill in the northern part of the marsh, created in 1969. Seventy acres are in City jurisdiction and 27 acres are within the Port District. Since 1973, the California least tern, an endangered species, has nested on the fill. Between 10 and 40 pairs have been observed from time to time.

The City plan is to develop the major part of the "D" Street fill for permanent year-round residential uses. One hundred foot wide buffer zones consisting partly of natural vegetation are to separate the residential development from the marsh. Eight acres are to be set aside and buffered for a least tern nesting site.

The Commission finds the eight-acre site is not sufficient and also the planned development, both in its intensity and its permanent character, are deleterious to the marsh ecosystem. First, concentrating the least tern colony makes it more vulnerable to predation. Proximity of residential uses increases possibility of such predation by domestic pets. Further, terns require large areas of open space and visibility before they can securely colonize an area, again due to need for protection from predators, and therefore presence of many large buildings are harmful to the species. (This consideration was also relevant to the 700-unit hotel on the Point.) Noise and light pollution from development, as discussed for Gunpowder Point, adversely impact native species and affect the balance of predation. Concentrating the colony in an eight-acre site increases susceptibility to predators and there is insufficient evidence an eight-acre site offers enough open space for a viable

colony of terns. The openness of the "D" Street fill that now attracts least terns to the area would be eliminated by the proposed development. The Commission concludes only light industrial development of the eastern one-third of the fill, plus a provision to fence off the western two-thirds of the fill from off-road vehicle use, would be compatible with the needs of the endangered least tern and the federal and state endangered species acts.

### (c) Tidelands Avenue Improvement

Using both earth fill and pilings, City proposes to extend Tidelands Avenue over salt water and salt pan areas of the marsh. As mitigation, it offered to restore marsh habitat elsewhere to compensate for areas filled. The Commission, however, found the project barred by section 30233, subdivision (c), which forbids any diking, dredging or filling in marshlands except to maintain or enhance their functional capacity, or for limited statutory purposes not relevant here, or "in already developed parts of south San Diego Bay, if otherwise in accordance with this division." The extension clearly would not enhance the marsh, although City argued it would have another beneficial effect favored by the Coastal Act, namely, facilitating public access to the coastlands. However, the Commission said it has consistently denied projects involving filling a wetland for any reason, citing for example the disapproved proposed widening of Carmel Valley Road in the Los Penasquitos Lagoon, denial of a permit for which project was affirmed in our decision in *City of San Diego* v. *California Coastal Com., supra*, 119 Cal.App.3d 228. Also, the Commission found no development existed in the part of the marsh to be crossed.

The Commission emphasized it did not rest its decision on a technicality: "The preponderance of scientific information available to the Commission suggests that construction of a roadway through the marsh would significantly degrade the entire marsh complex and would lead to further segmentation of an already very isolated and rare habitat." It pointed out the shrinking marshlands of Southern California are the final refuge for many endangered marsh dependent species, and extensive impacts would result from road construction and as a result of its presence in the marsh. Construction impacts were discussed under Gunpowder Point and include sedimentation and noise. Road presence would also cause increased noise levels and undesirable runoff polluted with heavy metals. Further, associated freeway modifications adjacent to Interstate 5 and the Sweetwater River flood control channel project

would permanently separate Sweetwater and Paradise Marshes, dramatically altering the existing estuarine ecosystem. Further, the Commission found a feasible less environmentally damaging alternative, namely, the possibility of providing connections from Route 54 via Interstate 5 to the "E" Street off-ramp in Chula Vista to assure adequate access to the bayfront development.

(d) Summary

The City does not deny the possibility of any of the predicted adverse effects of its development which the Commission foresees. Rather, it contends first, it will take all economically feasible mitigating measures and, second, the remaining risks are justified by the gain in public access to and enjoyment of the bayfront area as a result of the planned development. It says the various alternatives for development suggested by the Commission such as, for instance, moving the 700-unit hotel from the Point to the adjacent less environmentally significant Vener farms area, are not economically feasible. It also says the Commission looked only at the reports and recommendations of environmentalists and biologists and did not consider land planning and urban design problems, the needs of the local people, nor the economic reality of the situation. It points out the Commission expressed some hope the entire marsh complex might be acquired for preservation by the federal government, possibly by the Army corps of engineers as mitigation for the adjacent Route 54-Sweetwater River flood control project, but present shrinking governmental resources make such acquisition unlikely. Therefore, either the City must be permitted to develop the area in such manner as it can afford and will undertake, or alternatively, things will be left as they are. If they are left as they are, environmental degradation will occur as the result of off-road vehicle activity on the Point and the "D" Street fill, which has already destroyed many birds and nests; agricultural sedimentation and runoff to the marsh; pollution by rubbish accumulation and dumping on the Point; and continued lack of legitimate public access to the Chula Vista coastlands. In the long run, it contends, the best choice for the public is to permit the City's planned development which may have some adverse impact on the marshland but will also provide much public benefit in terms of cleaning up eyesores, providing parks, open space, protected bird nesting sites, natural buffer zones, coastal access and marsh preservation as well.

Commission, however, insists on retaining the actual marsh complex and immediately adjacent uplands (such as Gunpowder Point and the

"D" Street fill) in a relatively undeveloped condition, with possible limited pedestrian or bicycle access for study and nature observation only. It wishes to keep development back to the more remote uplands, particularly Vener farms, and also to keep the development low in intensity and transitory in character (hotels, motels, rather than housing) to minimize the impact on the marshlands. Commission emphasizes the integrated nature of the entire habitat, the great shrinkage in this type of environment which has occurred over this century as a result of massive dredging, filling and development of marshland areas, and the great necessity, therefore, to provide maximum safeguards for the Sweetwater Marsh which represents approximately 75 percent of San Diego Bay's remaining natural marshland. (It notes also only 360 acres remain of the approximately 2,450 acres of salt marsh community which once existed in San Diego Bay.) It was impressed not only with the comparative rarity of coastal marshland in California but also with the relative richness, biologically speaking, of this environment.[14] The Commission takes the position any conceivable adverse impact on this last remaining valuable marsh area is too great a risk to be justified.

■ We conclude the record is replete with substantial evidence of risk to the marsh environment if the proposed development is allowed. As stated at the outset of this discussion, the Coastal Act presents competing values: local planning options and needs versus statewide concerns in the preservation of the unique California coastal zone. The Commission as representative of the state and protector of the statewide interests in conservation and coastal management must have an effective role when it comes to balancing these values, else the agency has no real purpose. Local government is not expected to concern itself with statewide interests to the same extent that a statewide agency would and here, the statewide interests to be protected clearly appear. The Commission must be permitted to decide the necessary level of protection. If it is compelled to accept risks it regards as unjustified in the name of economic necessity, it cannot carry out its statutory mandate to provide permanent protection for the state's distinctive and valuable coastal zone for the benefit of the people of California (§ 30001.5). A number of specific statutes, most of them cited above in the footnotes, give additional underpinning to the Commission's authority in this re-

---

[14]The record reveals the San Diego Bay area is critical habitat for 180 species of birds, 9 species of fish and 11 species of macroinvertebrates as well as diverse and numerous species of invertebrates and other microorganisms which are not all known. Twenty-five species of salt marsh plants also live in the complex.

gard. Its job is to maintain and enhance marine resources of special biological and economic significance (§ 30230) of which the Sweetwater Marsh is such a resource. It must protect biological productivity and quality of estuaries such as this marsh complex (§ 30231). It may not permit diking, filling or dredging of wetlands except for limited stated purposes which do not include housing developments or hotels (§ 30233). It must protect environmentally sensitive habitat areas against significant disruption of habitat values (§ 30240), and the adjacent uplands to the marsh are such areas according to the opinions of many biologists and ecologists in this proceeding.

### CONCLUSION

Substantial evidence supports the decision of the Commission to disapprove the City's Local Coastal Program. The petition for writ of mandate is denied. Since petitioner and real party both sought issuance of the writ, each shall bear its own costs.

Brown (Gerald), P. J., and Staniforth, J., concurred.