[No. A059553. First Dist., Div. Two. Sept. 18, 1995.]

SAN MATEO COUNTY COASTAL LANDOWNERS' ASSOCIATION et al., Plaintiffs and Appellants, v.
COUNTY OF SAN MATEO et al., Defendants and Respondents;
SIERRA CLUB et al., Interveners and Respondents.

SAN MATEO COUNTY COASTAL LANDOWNERS' ASSOCIATION et al., Plaintiffs and Appellants.
CALIFORNIA COASTAL COMMISSION et al., Defendants and Respondents.

COUNSEL

Michael D. McCracken for Plaintiffs and Appellants.

Michael P. Murphy and Joseph Rusconi for Defendants and Respondents.

William Curtiss for Interveners and Respondents.

OPINION

KLINE, P. J.—

*Introduction*

In November 1986, San Mateo County voters enacted Measure A, "The Coastal Protection Initiative," amending the county's local coastal program,

making further amendments to the local coastal program essentially conditional upon voter approval (with limited exceptions) and providing that the county board of supervisors, by a four-fifths majority, may submit proposed amendments to the voters.

Appellant coastal landowners and nonprofit organizations representing coastal landowners, farmers, and others allege Measure A is subject to numerous constitutional and statutory defects. However, at the core of their challenge are the dual contentions that Measure A (1) deals with a matter of statewide concern and therefore may not properly be the subject of a local initiative, and (2) conflicts with the California Coastal Act of 1976 in that it frustrates a legislatively designed regulatory scheme of public hearings, public participation, and consultation between local agencies and the California Coastal Commission (Commission). The recent California Supreme Court opinion in *DeVita* v. *County of Napa* (1995) 9 Cal.4th 763 [38 Cal.Rptr.2d 699, 889 P.2d 1019] and *Yost* v. *Thomas* (1984) 36 Cal.3d 561 [205 Cal.Rptr. 801, 685 P.2d 1152] undermine both contentions. We shall reject these and the other challenges to Measure A raised by appellants and shall affirm the judgment of the trial court, denying appellants' petition for writ of mandate. (Code Civ. Proc., § 1085.)

*Facts*

San Mateo County voters adopted Measure A on November 4, 1986. The initiative amended the San Mateo County Local Coastal Program (LCP), which had originally been adopted in 1980 under authority of the California Coastal Act of 1976 (Coastal Act). (Pub. Resources Code, § 30000 et seq.) With limited exceptions, Measure A did not alter the substance of the 1980 LCP. Rather, Measure A identified 37 existing LCP land-use policies and provided they could not be weakened (that is no increase in nonagricultural development, density or use would be permitted) by amendment, absent a vote of the people. Section 10 of Measure A provides that it "may be repealed or amended only by a majority of the voters of San Mateo County voting in a valid election. The Board of Supervisors may, by four-fifths vote, after consideration by the County Planning Commission, submit proposed amendments to the voters." (Measure A, § 10, subd. (a).)[1] On December 10, 1987, the Commission approved, subject to modifications, four of the amendments submitted as part of the Measure A package and approved the remaining forty-nine amendments as submitted. The board of supervisors accepted two of the modifications and resubmitted the remaining two. The

---

[1]Section 10, subdivision (b) of Measure A excepts from the voter approval requirement amendments of the LCP with respect to farm labor housing areas.

Commission certified these two Measure A amendments as being consistent with the Coastal Act on March 22, 1988.

*Statement of the Case*

On March 20, 1987 San Mateo County Coastal Landowners' Association, a California nonprofit mutual benefit corporation, San Mateo County Farm Bureau, a California nonprofit corporation, and Citizens for Responsible Planning, a California nonprofit mutual benefit corporation (hereafter collectively appellants), filed a petition for writ of ordinary mandamus (Code Civ. Proc., § 1085) and complaint for declaratory relief against respondent County of San Mateo seeking a declaratory judgment that Measure A was invalid and a writ of mandate and prohibition commanding the County to cease enforcing it. (Super. Ct. No. 316851.)

The county answered and Sierra Club, Natural Resources Defense Council, Inc., Save Our Coast Committee, Committee for Green Foothills, League for Coastal Protection and Robert Cevasco (hereafter collectively Interveners) intervened to join with the county in opposing appellants' claims.

Subsequently, appellants, joined by plaintiff John L. De Benedetti, Jr., a coastal zone landowner, filed a second action seeking a writ of mandamus and declaratory relief against the county and the Commission. (Super. Ct. No. 329349.) On January 9, 1990, appellants filed an amended petition and complaint in that action.

On March 23, 1990, both actions (Nos. 316851 and 329349) were consolidated for trial. Interveners intervened in the consolidated action. The county, the Commission, and Interveners filed answers.

In May 1991, the county and the Commission filed motions for summary adjudication and Interveners moved for judgment on the pleadings.

On July 26, 1991, the trial court granted in part and denied in part the motions of the county and Commission for summary adjudication of issues.

The remaining causes of action were tried to the court and its judgment was entered on July 16, 1992.

This timely appeal followed.

## I.

### MEASURE A NEITHER CONFLICTS WITH NOR IS PREEMPTED BY THE COASTAL ACT

A. *The Coastal Act.*

In *Yost* v. *Thomas*, *supra*, 36 Cal.3d 561, 565-567 (*Yost*), our Supreme Court described in some detail the Coastal Act and the respective roles of local government and the Commission in the preparation and certification of the LCP:

"The Coastal Act of 1976 (Pub. Resources Code, § 30000 et seq.)[2] was enacted by the Legislature as a comprehensive scheme to govern land use planning for the entire coastal zone of California. The Legislature found that 'the California coastal zone is a distinct and valuable natural resource of vital and enduring interest to all the people'; that 'the permanent protection of the state's natural and scenic resources is a paramount concern'; that 'it is necessary to protect the ecological balance of the coastal zone' and that 'existing developed uses, and future developments that are carefully planned and developed consistent with the policies of this division, are essential to the economic and social well-being of the people of this state . . . .' (§ 30001, subds. (a) and (d)). '[T]he basic goals of the state for the coastal zone' are to: '(a) Protect, maintain, and, where feasible, enhance and restore the overall quality of the coastal zone environment and its natural and manmade resources. [¶] (b) Assure orderly, balanced utilization and conservation of coastal zone resources taking into account the social and economic needs of the people of the state. [¶] (c) Maximize public access to and along the coast and maximize public recreational opportunities in the coastal zone consistent with sound resources conservation principles and constitutionally protected rights of property owners. [¶] (d) Assure priority for coastal-dependent and coastal-related development over other development on the coast. [¶] [and] (e) Encourage state and local initiatives and cooperation in preparing procedures to implement coordinated planning and development for mutually beneficial uses, including educational uses, in the coastal zone.' (§ 30001.5.)

"A combination of local land use planning procedures and enforcement to achieve maximum responsiveness to local conditions, accountability, and

---

[2]All statutory references, unless otherwise indicated, are to the Public Resources Code. All statutory language is from those statutes in effect at the time of the trial court decision. (*Yost, supra*, 36 Cal.3d at p. 565, fn. 3.)

public accessibility, as well as continued state coastal planning and management through a state coastal commission are relied upon to insure conformity with the provisions of the act (§ 30004, subds. (a) and (b)). Therefore, all local governments lying in whole or in part within the coastal zone had to prepare and submit to the Commission a local coastal program (LCP) (§ 30500, subd. (a)). The LCP consists of a local government's '(a) land use plans, (b) zoning ordinances, (c) zoning district maps, and (d) within sensitive coastal resources areas, other implementing actions, . . .' (§ 30108.6.) The precise content of each LCP is determined by the local government in full consultation with the Commission (§ 30500, subd. (c)) and must meet the requirements of, and implement the provisions and policies of [the act] at the local level (§ 30108.6).

"Sections 30200 et seq. set forth the specific policies which constitute the standards by which the adequacy of local coastal programs are to be determined (§ 30200). . . .

"The LCP may be submitted to the Commission all at once or in two phases—a land use plan (LUP) and zoning ordinances, etc. (§ 30511). [3] The Commission will certify a LUP 'if it finds that a land use plan meets the requirements of, and is in conformity with, the policies of Chapter 3 (commencing with Section 30200) . . . .' (§ 30512, subd. (c).) 'The commission shall require conformance with the policies and requirements of Chapter 3 . . . only to the extent necessary to achieve the basic goals [of the act].' (§ 30512.2.) The Commission may only reject zoning ordinances on the grounds that they do not conform, or are inadequate to carry out the provisions of the certified land use plan (§ 30513). A certified LCP and all local implementing ordinances may be amended by a local government, but no such amendment shall take effect until it has been certified by the Commission (§ 30514)."

B.   *DeVita validates adoption of Measure A through the initiative process.*

*Yost, supra,* 36 Cal.3d 561, upheld the use of a referendum to overturn a general plan amendment implementing a local coastal plan under the Coastal Act. *Yost* held that general plan amendments were *legislative acts* subject to referendum. (36 Cal.3d at p. 570; see *DeVita* v. *County of Napa, supra,* 9 Cal.4th 763, 775.) *Yost* "further found that the Coastal Act, although setting 'minimum standards and policies' for localities to follow in developing

---

[3]The land-use plan portion of the LCP is part of the San Mateo County General Plan. Implementing ordinances are part of the county's zoning regulations. (Trial testimony of Mark Duino, principal planner of the San Mateo County Planning Department.)

land-use plans, left 'wide discretion to a local government . . . to determine the contents' of such plans, and therefore did not preclude general plan amendments implementing a local coastal plan from being subject to referendum. ([*Yost, supra,* 36 Cal.3d] at pp. 572-573.)" (*DeVita* v. *County of Napa, supra,* 9 Cal.4th 763, 775.)

Although holding a general plan amendment implementing an LCP could be subject to referendum, *Yost* did not determine whether such amendment could be enacted by initiative. (36 Cal.3d at pp. 573-574.) Thereafter, *Committee of Seven Thousand* v. *Superior Court* (1988) 45 Cal.3d 491, 504 [247 Cal.Rptr. 362, 754 P.2d 708] "endorsed the position that general plans can be amended by initiative" (*DeVita* v. *County of Napa, supra,* 9 Cal.4th 763, 775); however in *Lesher Communications, Inc.* v. *City of Walnut Creek* (1990) 52 Cal.3d 531, 540 [277 Cal.Rptr. 1, 802 P.2d 317] the court noted several arguments against general plan amendment initiatives and implicitly invited reconsideration of the issue.

Recently, this question was resolved by *DeVita* v. *County of Napa, supra,* 9 Cal.4th 763 (*DeVita*), which held the land-use element of a county's general plan can be amended by initiative and upheld provisions of an initiative measure making redesignation of existing agricultural land and open space essentially conditional on voter approval for 30 years. (*Id.* at pp. 770-771.)[4]

▮ Although appellants maintain *DeVita* does not resolve their central claims—that an LCP may not be amended by initiative and that Measure A itself and the procedures it establishes for future amendment of the LCP conflict with Coastal Act provisions mandating "full consultation" and

---

[4]*DeVita* reasoned: "Those courts that have examined the planning law have concluded that '[t]he adoption and amendment of a general plan is a local legislative matter and not of statewide concern,' and therefore the proper subject of initiative. [Citations.] This generally accepted principle was set forth in an opinion of the Attorney General in 1983: 'A . . . general plan may be amended by the initiative process, but such amendment must comply with the substantive requirements for a general plan.' (66 Ops.Cal.Atty.Gen. 258, 259 (1983).) [¶] The correctness of the Attorney General's view seemed confirmed by our own opinion the following year in *Yost, supra,* 36 Cal.3d 561, upholding the use of referendum to overturn a general plan amendment implementing a local coastal plan under the Coastal Act of 1976 (Coastal Act) (Pub. Resources Code, § 30000 et seq.). We held that general plan amendments were legislative acts subject to referendum. (36 Cal.3d at p. 570.) We further found that the Coastal Act, although setting 'minimum standards and policies' for localities to follow in developing land-use plans, left 'wide discretion to a local government . . . to determine the contents' of such plans, and therefore did not preclude general plan amendments implementing a local coastal plan from being subject to referendum. (*Id.* at pp. 572-573.)" (*DeVita, supra,* 9 Cal.4th at pp. 774-775.)

"public participation" in the LCP amendment process—we believe *DeVita* is dispositive, as it undermines the foundation of appellants' argument.

The land-use-plan portion of a county's local coastal program is part of its general plan. (See §§ 30108.5, 30108.6.)[5] By definition, the local coastal program amendments at issue here fall squarely within the holding of *DeVita*. Further, *DeVita*'s extensive reliance upon *Yost,* without limiting language, demonstrates that LCP amendments are analogous to general plan amendments as local legislative acts subject to initiative and that local governments have broad discretion to determine the content of their land-use plans.

■ *DeVita* recognized "that the local electorate's right to initiative and referendum is guaranteed by the California Constitution, article II, section 11,[6] and is generally co-extensive with the legislative power of the local governing body. [Citation.]"[7] (*DeVita, supra,* 9 Cal.4th at p. 775.) Absent a clear showing of contrary legislative intent, it is presumed that legislative decisions of a city council or board of supervisors are subject to initiative and referendum. (*Ibid.*)

■ ■ Pointing to *Yost* as an example, *DeVita* reaffirmed that a statutory scheme does not restrict the power of initiative or referendum

---

[5]As earlier noted, the Coastal Act provides that a "local coastal program" is comprised of the "local government's (a) land use plans, (b) zoning ordinances, (c) zoning district maps, and (d) within sensitive coastal resources areas, other implementing actions which, when taken together, meet the requirements of, and implement the provisions and policies of, this division at the local level." (§ 30108.6.) A "land use plan" is defined as "the relevant portions of *a local government's general plan . . .* which are sufficiently detailed to indicate the kinds, location, and intensity of land uses, the applicable resource protection and development policies and, where necessary, a listing of implementing actions." (§ 30108.5, italics added.)

[6]"California Constitution, article II, section 11 provides: 'Initiative and referendum powers may be exercised by the electors of each city and county under procedures that the Legislature shall provide. This section does not affect a city having a charter.' " (*DeVita, supra,* 9 Cal.4th at p. 775, fn. 5.)

[7]" '[W]e will presume, absent a clear showing of the Legislature's intent to the contrary, that legislative decisions of a city council or board of supervisors . . . are subject to initiative and referendum.' This presumption rests on the fact that the 1911 amendment to the California Constitution conferring the right of initiative and referendum was '[d]rafted in light of the theory that all power of government ultimately resides in the people' and that 'the amendment speaks of initiative and referendum, not as a right granted the people, but as a power reserved by them.' (*Associated Home Builders [etc., Inc.* v. *City of Livermore* (1976)] 18 Cal.3d 582, 591 [135 Cal.Rptr. 341, 557 P.2d 473], fn. omitted.) It is "the duty of the courts to jealously guard this right of the people" [citation] . . . . "[I]t has long been our judicial policy to apply a liberal construction to this power wherever it is challenged in order that the right [to local initiative or referendum] be not improperly annulled." ' (*Ibid.*)" (*DeVita, supra,* 9 Cal.4th at pp. 775-776.)

merely because some elements of statewide concern are present. (9 Cal.4th at pp. 780-781.) Acknowledging that the Coastal Act addressed in *Yost* established "a regime of state regulation more intrusive than the planning law" (*id.*, at p. 781), *DeVita* relied upon the holding and analysis of *Yost*: "In affirming the validity of the referendum, we stated: 'There is no doubt that the Coastal Act is an attempt to deal with coastal land use on a statewide basis. Nor is it disputed that in matters of general statewide concern the state may preempt local regulation [citation]. However, state regulation of a matter does not necessarily preempt the power of local voters to act through initiative and/or referendum [citations].' (36 Cal.3d at p. 571; [citations].) As our decision in *Yost* illustrates, it is erroneous to assume that a statute or statutory scheme that both asserts certain state interests and defers in other respects to local decisionmaking implies a legislative intent to bar the right of initiative. Rather, courts must inquire concretely into the nature of the state's regulatory interests to determine if they are fundamentally incompatible with the exercise of the right of initiative or referendum, or otherwise reveal a legislative intent to exclusively delegate authority to the local governing body." (*Id.* at p. 781.)

As explained in *Yost*, the Coastal Act "does not explicitly claim to preempt local planning authority . . . ." (36 Cal.3d at p. 571.) Examination of the general provisions of the Coastal Act led *Yost* to conclude that the local government retained wide discretion to determine both the contents of its land use plans and how to implement them. (*Id.* at pp. 571-573.)

"The wording of these and other sections do not suggest preemption of local planning by the state, rather they point to local discretion and autonomy in planning subject to review for conformity to statewide standards. As was noted in *City of Chula Vista* v. *Superior Court* (1982) 133 Cal.App.3d 472, 488 . . . , 'the Commission in approving or disapproving an LCP does not create or originate any land use rules and regulations. It can approve or disapprove but it cannot itself draft any part of the coastal plan.'[8] [¶] . . . [¶] Under the act, local governments, therefore, have discretion to zone one piece of land to fit any of the acceptable uses under the policies of the act, but they also have the discretion to be more restrictive than the act. The

---

[8]"The discretion accorded local governments in establishing, creating and implementing land use plans is most clearly reflected in the language of section 30005. 'No provision of this division is a limitation on any of the following: [¶] (a) Except as otherwise limited by state law, on the power of a city or county or city and county to adopt and enforce additional regulations, not in conflict with this act, imposing further conditions, restrictions, or limitations with respect to any land or water use or other activity which might adversely affect the resources of the coastal zone.' (§ 30005, subd. (a).)" (*Yost, supra,* 36 Cal.3d at p. 572.)

Coastal Act sets minimum standards and policies with which local governments within the coastal zone must comply; it does not mandate the action to be taken by a local government in implementing local land use controls. The Commission performs a judicial function when it reviews a local government's LCP—it determines whether the LCP meets the minimum standards of the act (*City of Chula Vista* v. *Superior Court, supra,* 133 Cal.App.3d 472, . . .), but once an LCP has been approved by the Commission, a local government has discretion to choose what action to take to implement its LCP: it can decide to be more restrictive with respect to any parcel of land, provided such restrictions do not conflict with the act." (*Yost, supra,* 36 Cal.3d at pp. 572-573, fn. omitted.)

"The act, therefore, leaves wide discretion to a local government not only to determine the contents of its land use plans, but to choose how to implement these plans. Under such circumstances a city is acting legislatively and its actions are subject to the normal referendum procedure." (*Yost, supra,* 36 Cal.3d at p. 573.)

Taken together, *Yost* and *DeVita* leave no doubt that amendments to the LCP, such as measure A, may be adopted by initiative and are not preempted by the Coastal Act.

C. *Measure A does not conflict with the Coastal Act.*[9]

Appellants further contend that Measure A conflicts with provisions of the Coastal Act which require the local agency to establish "the precise

---

[9]The Commission determined that Measure A amendments to the LCP were consistent with the Coastal Act. We agree with the Commission that insofar as appellants claim Measure A's adoption or its provisions conflict with the Coastal Act, such challenge should have been brought in an action for a writ of administrative mandamus pursuant to Code of Civil Procedure section 1094.5.

The Commission is the sole agency with statutory authority to review LCP submittals for consistency with the Coastal Act. (§ 30500 et seq.) In so doing, the Commission acts in a quasi-judicial capacity. (E.g., *City of Chula Vista* v. *Superior Court* (1982) 133 Cal.App.3d 472, 488 [183 Cal.Rptr. 909]; *State of California* v. *Superior Court (Veta)* 1974) 12 Cal.3d 237, 249 [115 Cal.Rptr. 497, 524 P.2d 1281]; see *Sierra Club* v. *California Coastal Com.* (1993) 12 Cal.App.4th 602, 609 [15 Cal.Rptr.2d 779].) Consequently, challenge to the Commission's actions in LCP certification decisions is through administrative mandate.

Appellants did not pursue a petition for writ of administrative mandamus. Nor do they contend that the voluminous administrative record of the Measure A certification process does not support the Commission's certification of Measure A as consistent with the Coastal Act. Appellants' claim that Measure A conflicts with the consultation and participation requirements of the Coastal Act is, however, intertwined with their contentions that an LCP amendment is not properly the subject of initiative and that Measure A was preempted by the Coastal Act. Because it is difficult to separate these issues, we shall review this claim despite appellants' failure to advance it by way of an appropriate writ petition.

content" of the LCP amendment in "full consultation" with the Commission and with "full public participation." (§ 30500, subd. (c); see § 30503.)[10]

These sections require that LCP's be prepared by local governments in "full consultation with the commission and with full public participation" (§ 30500, subd. (c)) and that ". . . the public, as well as all affected governmental agencies . . . shall be provided maximum opportunities to participate." (§ 30503.) The Commission, sustained by the trial court, found that LCP amendments generated by initiative and submitted after enactment to the Commission for certification did not conflict with Coastal Act requirements for "public participation" and "full consultation." We agree.

Appellants contrast the "normal" method for adoption of LCP amendments by local entities with the initiative process by which Measure A was enacted and the procedures Measure A adopts for future amendments to the LCP. Specifically, appellants argue that the informal consultation occurring in the "normal process" between the Commission, county planning department staff, and interested local agencies does not occur under Measure A. Further, in the "normal" method for adoption of LCP amendments the city council or board of supervisors is the body making the ultimate decision. The typical LCP amendment is subject to debate at small citizen planning sessions, is discussed in the local media, and is ultimately voted on by the council or board after public hearings.

However, as both the Commission and the trial court found, Measure A and the LCP amendment procedure adopted by Measure A fully comply with all relevant sections of the Coastal Act. Although informal consultations between the local entity's planning staff and the Commission are encouraged, it is the local entity that is charged with preparation of an LCP amendment. As stated before, the Commission's role in reviewing a local government's LCP is quasi-judicial—it determines whether the LCP meets

---

[10]Section 30500, subdivision (c) provides: "The precise content of each local coastal program shall be determined by the local government, consistent with Section 30501, in full consultation with the commission and with full public participation."

Section 30503 provides: "During the preparation, approval, certification, and amendment of any local coastal program, the public, as well as all affected governmental agencies, including special districts, shall be provided maximum opportunities to participate. Prior to submission of a local coastal program for approval, local governments shall hold a public hearing or hearings on that portion of the program which has not been subjected to public hearings within four years of such submission."

the minimum standards of the act. (*Yost, supra*, 36 Cal.3d at p. 572; *City of Chula Vista* v. *Superior Court, supra*, 133 Cal.App.3d 472.)[11]

As evidence before the Commission as part of the process of certification of Measure A and at trial established, much of the same citizen participation occurred in the formulation and campaign on the Measure A initiative as in the "normal" LCP amendment process. The matter was discussed and debated at public hearings before the board of supervisors, at citizens meetings and in the press. Instead of representatives voting on the LCP amendments, however, the people voted directly. As Peter Douglas, executive director of the Commission testified, in the Commission's view, the initiative process not only met the Coastal Act's public participation standards, but was "the ultimate of public participation."

Mark Duino, principal planner with the San Mateo County Planning Department, testified at trial that the process for initiating and analyzing an LCP amendment under Measure A by staff input from various departments would be the same as it is for an amendment not subject to Measure A.

Further, as Douglas testified, the requisite consultation between the local entity's staff and the Commission's staff takes place at the time of *submittal* of the LCP amendment to the Commission. That consultation occurred here for Measure A and would occur for future amendments under Measure A.

Finally, appellants' arguments regarding full participation and consultation parallel those rejected by the California Supreme Court in *DeVita*. In *DeVita* the appellants argued that voter initiatives violated the Government Code section 65351 prescription of "public participation" during the formulation of a general plan amendment and also violated the Government Code section 65352 direction "regarding consultation with public agencies prior to enactment of general plan amendments." (9 Cal.4th at at pp. 786-787.) The court held ". . . none of the procedural requirements imposed on the legislative body by the planning law can be presumed to limit the right to

---

[11]"A local government can amend a certified LCP or LUP [land-use plan]. (§ 30514). An amendment which authorizes a use designated as a permitted use in the LCP does not require certification by the Commission; an amendment which authorizes a use other than that designated in the LCP as a permitted use does require certification by the Commission (§ 30514, subd. (d))." (*Yost, supra*, 36 Cal.3d at p. 573, fn. 9.)

Although the Commission can suggest modifications to the proposed LCP amendment to bring it into conformity with the Coastal Act, and may disapprove the proposed amendment if it does not comply with the act, county chief planner Mark Duino testified that he could not recall any modification suggested by the Commission on an amendment operative in the rural area of the coastal zone which operated to loosen the restrictions on nonagricultural development.

amend the general plan by initiative." (*Id.* at p. 787.) As with general plans, the procedural requirements of sections 30500, subdivision (c) and 30503 regarding the amendment of LCP's can not be presumed to limit the right of the citizens of San Mateo County to amend their LCP by initiative.

## II.

## MEASURE A DOES NOT CONFLICT WITH STATE HOUSING LAW

A. *Measure A does not prevent updating of the county's housing element.*

A local agency's general plan must contain a housing element. (Gov. Code, § 65302, subd. (c).) The general plan and all of its elements and parts comprise an "integrated, internally consistent and compatible statement of policies for the adopting agency." (Gov. Code, § 65300.5.) State housing law requires periodic review and assessment of the current housing needs of the community. (Gov. Code, § 65580 et seq.) This review and assessment must take into account any low- or moderate-income housing approved for construction within the coastal zone. (Gov. Code, § 65588, subd. (d).) ■ Appellants contend that by requiring a supermajority vote of the board of supervisors and a vote of the electorate to amend the LCP, Measure A will make future periodic review and updating of county's housing element "virtually impossible." Consequently, they contend Measure A violates state housing law requiring mandatory review, revision and updating of general plan housing elements "as appropriate and necessary" and at least every five years. (Gov. Code, § 65588.) Appellants also contend the LCP relies upon a housing policy which "fails to incorporate a current assessment of the need for affordable housing within the coastal zone." The trial court concluded that appellants failed to prove that Measure A effected any change in the existing housing policy so as to render policy 3.27 (the local coastal program housing policy in existence at the time of Measure A's adoption) not in current compliance with Government Code section 65588. We agree with the trial court's assessment.

Appellants have the burden of proving a land-use regulation arbitrary or irrational. (*Goldblatt* v. *Hempstead* (1962) 369 U.S. 590, 596 [8 L.Ed.2d 130, 135, 82 S.Ct. 987].)

Measure A did not amend any provision of county's housing element. It simply referred to a single existing housing policy (policy 3.27) of the existing LCP. Appellants presented no evidence whatsoever to establish that Measure A effected a change in policy 3.27 so as to render it in violation of Government Code section 65588. Indeed, on its face that policy promotes

affordable housing by granting a density bonus for such units in rural areas of the coastal zone. References in Measure A to policy 3.27 exempt affordable housing to the extent authorized in that LCP policy as of March 25, 1986. (Measure A, policies 1.8 c., 5.14 c.)

Appellants' challenge boils down to a claim that Measure A "freezes" affordable housing policies in effect as of March 25, 1986, and consequently does not provide the flexibility needed to conduct the review and updating of the housing element mandated by state law. At trial, the county demonstrated that its ability to amend its housing element had not been unduly burdened by Measure A. The county had completed a housing element review and update in 1987, after adoption of Measure A and, at the time of trial in 1991, was in the process of completing another update (including consideration of an amendment to policy 3.27) in accordance with the requirements of Government Code section 65588, to review and revise the housing element at five-year intervals. (Testimony of county planner Lisa Aozasa) In contrast, as found by the trial court, appellants presented no evidence establishing a breach of the county's obligation or indicating that Measure A impaired that obligation.

*DeVita* explicitly declined to consider whether the housing element of the general plan may be amended by initiative. (9 Cal.4th at p. 793, fn. 11.) The Supreme Court recognized that ". . . the housing element, unlike the other mandatory elements, must be amended according to a fixed schedule—at least once every five years. (Gov. Code, § 65588, subd. (b).) Moreover, any draft amendment to the housing element must be submitted to the state Department of Housing and Community Development for review and comments. (Gov. Code, § 65585.)" (*Ibid.*) Because the initiative amendment to the general plan neither purported to amend the housing element nor was found inconsistent with it, *DeVita* did not decide the status of an initiative that either amends or conflicts with the housing element of a general plan. (*Ibid.*) In this case, too, we see no present inconsistency between Measure A and the relevant part of the housing element of the general plan.

Further, although *DeVita* did not determine whether amendment of a housing element may be accomplished by initiative, it nevertheless rejected a contention similar to that raised here concerning the alleged inflexibility of an initiative measure: "Our ruling today does not imply that localities may allow their general plans to become obsolete. Indeed, since the passage of Measure J, the Napa County General Plan has continued to be amended and updated, as the trial court found. It is of course conceivable that the Napa County General Plan will, as the result of Measure J, fall so far behind

changing local conditions that the County will fail to fulfill an implied statutory duty to keep its general plan current. [Citation.] But as we said in *Yost, supra,* 36 Cal.3d at page 574, in considering whether the exercise of the referendum would frustrate the implementation of the land-use plan (LUP) of a local coastal plan: 'True, if down the road the people exercise their referendum power in such a way as to frustrate any feasible implementation of the LUP, some way out of the impasse will have to be found. At this point, however, the system is not being put to so severe a test.' [¶] . . . We should not presume—nor, given the rule that doubts should be resolved in favor of the initiative and referendum power, should we assume the Legislature presumed—that the electorate will fail to do the legally proper thing." (9 Cal.4th at pp. 792-793.)

Appellants have failed to show that Measure A frustrates implementation of the County's LCP or its housing element.

B.   *Government Code section 65588, subdivision (b)(2).*

■   Appellants' third cause of action alleged Measure A was invalid because it was part of the general plan, which itself was defective because the county had failed to review the housing element of its general plan in accordance with the timetable set forth in Government Code section 65588, subdivision (b)(2).[12] The trial court granted summary adjudication of this issue, ruling "the schedule established by that section for review and adoption of the revision to the County's Housing Element is directory, not mandatory, and mere noncompliance with the schedule would not operate to automatically invalidate the County's Housing Element or, by extension, the General Plan or Measure A." On appeal, appellants reiterate their contention, without citation of authority and with no development of the argument.

We agree with the trial court that the timetable set by section 65588 was directory, rather than mandatory. "Requirements relating to the time within which an act must be done are directory rather than mandatory unless a contrary intent is clearly expressed. (*Edwards* v. *Steele* (1979) 25 Cal.3d 406, 410 . . . and cases cited therein.) Failure to provide for a consequence or penalty for noncompliance strongly suggests that the provision is merely directory. [Citation.]" (*Meridian Ocean Systems, Inc.* v. *State Lands Com.* (1990) 222 Cal.App.3d 153, 168 [271 Cal.Rptr. 445]; see *Morris* v. *County*

---

[12] "(b) The housing element shall be revised as appropriate, but not less than every five years, to reflect the results of this periodic review. [¶] . . . [¶] (2) Local governments within the regional jurisdiction of the Association of Bay Area Governments: January 1, 1985, for the first revision, and July 1, 1990, for the second revision." (Gov. Code, § 65588, subd. (b)(2).)

*of Marin* (1977) 18 Cal.3d 901, 908 [136 Cal.Rptr. 251, 559 P.2d 606].) Further, appellants' attack must fail as they have "failed to establish a 'nexus' between the claimed deficiency in the plan and the subject ordinance." (*Flavell* v. *City of Albany* (1993) 19 Cal.App.4th 1846, 1852 [25 Cal.Rptr.2d 21].) "As can be seen, appellant[s'] attack concerns certain time-related inadequacies rather than actual substantive inadequacies. In order to invalidate [the ordinance] on this basis, however, appellant[s] must do more than simply point out these inadequacies. [They] must, in addition to this, establish (1) that these omissions have resulted in certain consequences and (2) how the ordinance is affected by these consequences. In our case, appellant[s] have made no showing as to how the inadequacy of failing to timely revise the element would have any bearing or effect on the ordinance." (*Ibid.*)

III.

OPEN SPACE AND AGRICULTURAL EASEMENT EXACTIONS

*(Policies 1.9a and 5.16)*

The trial court granted summary adjudication on appellants' challenges to Measure A policies 1.9a and 5.16 requiring an applicant for land division to grant the county conservation/open space or agricultural easements as a condition of approval. These easements limit the use of the land covered thereby to specified uses consistent with open space (1.9a) or agricultural (5.16) use.[13] Appellants had challenged these policies on the grounds that

---

[13]Policies 1.9a and 5.16 are reenactments of virtually identical provisions in the county's LCP in effect since 1980. The only change to each policy consists of the parenthetical phrase "(and the County to accept)" following the requirement that the applicant grant the easement. Appellants did not challenge the policies at the time they were originally adopted by the county.

As Mark Duino explained: "An agriculture or open space easement would be imposed only after an applicant for a land division submits a proposed Master Land Division Plan or tentative subdivision map. This plan or subdivision map would show a proposed division of land, taking into account the development potential of each parcel. The residual parcel would then be identified, and an agricultural or open space easement possibly imposed on that residual parcel. In some cases, the requirement could be waived by the County. For example, under Policy 1.9(b) of the LCP, if a subdivision application was submitted in conjunction with an affordable housing project, the easement requirement would be waived."

"Among the uses allowed in the open space land designation are single-family residences, multi-family residences, motels, and restaurants, public and private clubs, temporary trailer parks, farm labor housing, commercial recreation, nurseries and greenhouses, churches, schools, fire stations, oil and gas exploration, production and storage." "The uses allowable

they violated due process and constituted a "taking" without compensation[14] (fourth cause of action) and that they violated Civil Code section 815.3 subdivision (b) (fifth cause of action, No. 329349). The trial court concluded the due process and taking claims were not ripe for review and that the policies in any event were "facially valid police power regulations." The court further concluded that the easements required by the policies were not prohibited by Civil Code section 815.3 subdivision (b).

## A. *Ripeness.*

■ To the extent appellants' claims may be viewed as a challenge to Measure A "*as applied,*" they are clearly not ripe for judicial review. As the trial court recognized, appellants' claim that Measure A was unconstitutional "as applied" to their properties does not present a concrete controversy ripe for adjudication because they have not submitted a subdivision plan or applied for a permit or variance from the local authority which has been conclusively denied (or in this instance subjected to the easement requirement). (*Kinzli* v. *City of Santa Cruz* (9th Cir. 1987) 818 F.2d 1449, 1453; see, e.g., *MacDonald, Sommer & Frates* v. *Yolo County* (1986) 477 U.S. 340, 348-351 [91 L.Ed.2d 285, 294, 106 S.Ct. 2561, 2566]; *Williamson Planning Comm'n* v. *Hamilton Bank* (1985) 473 U.S. 172 [87 L.Ed.2d 126, 105 S.Ct. 3108]; *Agins* v. *Tiburon* (1980) 447 U.S. 255, 260 [65 L.Ed.2d 106, 111-112, 100 S.Ct. 2138]; *Hensler* v. *City of Glendale* (1994) 8 Cal.4th 1 [32 Cal.Rptr.2d 244, 876 P.2d 1043]; *Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 117-118 [109 Cal.Rptr. 799, 514 P.2d 111]; *Smith* v. *City and County of San Francisco* (1990) 225 Cal.App.3d 38, 46 [275 Cal.Rptr. 17]; Longtin's, Cal. Land Use (1995 supp.) § 12.30[1], pp. 548-549.)[15]

## B. *Facial challenge.*

■ Apparently recognizing that an "as applied" challenge must founder on the ripeness doctrine, appellants now contend that their challenge was not

---

on land covered by an agricultural easement include agricultural uses, non-residential development customarily considered accessory to agriculture and farm labor housing."

Neither the agricultural easement nor the conservation/open space easement authorizes any public use or entry. Exclusive use and possession of the land remain in the owner.

[14]Plaintiffs did not argue their takings claim at trial and have not pursued it on this appeal.

[15]Although ripeness is a doctrine usually applied in the inverse condemnation or "takings" context, in *Smith* v. *City and County of San Francisco, supra,* 225 Cal.App.3d 38, we held appellants' substantive due process and equal protection claims "subject to the same ripeness standards applied generally to constitutional challenges of land use regulation." (*Id.* at p. 54, citing, among others, *Williamson Planning Comm'n* v. *Hamilton Bank, supra,* 473 U.S. at pp. 199-200 [87 L.Ed.2d at pp. 146-148] and *Kinzli* v. *City of Santa Cruz, supra,* 818 F.2d 1449, 1455-1456.)

to Measure A "as applied" but was a "facial challenge" to the constitutionality of the ordinance.[16] We conclude appellants have not demonstrated that policies 1.9 and 5.16 render Measure A invalid on its face. ■ "A claim that a regulation is *facially* invalid is only tenable if the terms of the regulation will not permit those who administer it to avoid an unconstitutional *application* to the complaining parties. [Citations.] This restraint stems from the prudent judicial policy of avoiding officious checking of the political branches of the government. (See Tribe, American Constitutional Law (1988) § 3-10; [citations].) The question whether an alleged unconstitutional *application* of a regulation may be avoided is not governed by the conclusional allegations of the complaint. Rather, it turns upon the court's appraisal of the legal effect of the regulation. (See, e.g, *Agins* v. *Tiburon* (1980) 447 U.S. 255, 259, fn. 6 . . . .)" (*Tahoe-Sierra Preservation Council* v. *State Water Resources Control Bd.* (1989) 210 Cal.App.3d 1421, 1442 [259 Cal.Rptr. 132]; see also *Pennell* v. *San Jose* (1988) 485 U.S. 1, 8-14 [99 L.Ed.2d 1, 12-15, 108 S.Ct. 849, 856-858]; *Keystone Bituminous Coal Assn.* v. *DeBenedictis* (1987) 480 U.S. 470, 494-496 [94 L.Ed.2d 472, 494-495, 107 S.Ct. 1232]; *Sierra Club* v. *California Coastal Com.*, *supra*, 12 Cal.App.4th 602, 617-619; 2 Longtin's Cal. Land Use (2d ed. 1987) §§ 12.04[5], 12.15[3], 1230[3], pp. 1072-1074, 1099-1100, 1111; *id.* (1995 supp.) § 12.30[3], p. 558.)

■ Appellants have not shown that unconstitutional application of these policies by the county is unavoidable. Not only do various uses of their property remain open to appellants following application of policies 1.9a and 5.16, but section 8 of Measure A specifically provides: "The provisions of this ordinance shall not be applicable to the extent, but only to the extent, that they would violate the constitution or laws of the United States or the State of California." The county has the flexibility to avoid potentially unconstitutional application of easement requirements, should these requirements "go too far" as specifically applied to a particular parcel of property.

C.   *Dolan v. City of Tigard (1994) 512 U.S. __ [129 L.Ed.2d 304, 114 S.Ct. 2309].*

■ Appellants contend that the recent decision in *Dolan* v. *City of Tigard* (1994) 512 U.S. __ [129 L.Ed.2d 304, 114 S.Ct. 2309] (*Dolan*) supports their

---

[16]"The ripeness doctrine, requiring a final decision regarding the application of the regulation to the specific property, only applies to legal attacks on the regulation 'as applied' to a specific property. It does not apply when a property owner challenges the 'facial' validity of the land use regulation. However, such facial attacks are seldom successful, since a regulation will only be declared invalid 'on its face' when its terms will not permit those who administer it to avoid confiscatory or unconstitutional results in 'any' potential application to the complaining parties." (Longtin's, Cal. Land Use, *supra*, § 1230[3] p. 558, and cases there cited.)

claim that Measure A policies 1.9 and 5.16 are unconstitutional conditions. *Dolan* does not advance appellants' argument because it involved an "as applied" challenge to a permit condition imposed by an adjudicatory body, rather than a challenge to a legislatively adopted land use and zoning scheme such as Measure A.

In *Dolan*, the city planning commission conditioned approval of Dolan's application to expand her store and pave her parking lot upon compliance with dedication of land for a public greenway and a pedestrian/bicycle pathway. Dolan appealed the commission's denial of her request for variances to the local land use board of appeals and then to state and federal courts. The United States Supreme Court held the city's dedication requirements constituted an uncompensated taking of the property. (512 U.S. at p. ___ [129 L.Ed.2d at pp. 315-323, 114 S.Ct. at pp. 2316-2321].) The court reiterated that in the context of administrative permit decisionmaking, there must exist an "essential nexus" between the "legitimate state interest" and the permit condition exacted by the city to further that interest. (*Id.* at p. ___ [129 L.Ed.2d at p. 317, 114 S.Ct. at p. 2317], relying upon *Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825, 837 [97 L.Ed.2d 677, 689-690, 107 S.Ct. 3141].) Finding such nexus the *Dolan* court articulated the required degree of connection between the exactions and the projected impact of the proposed development, stating that there must be a "rough proportionality" between the two. (*Dolan, supra*, 512 U.S. at p. ___ [129 L.Ed.2d at p. 320, 114 S.Ct. at pp. 2319-2320].) Further, the burden was on the city to demonstrate that rough proportionality.

The court went to some lengths to distinguish the situation in *Dolan*, involving an adjudicative decision by the city, from the traditional legislative and land-use function undertaken by local governments at issue in this case:

"[T]he authority of state and local governments to engage in land use planning has been sustained against constitutional challenge as long ago as our decision in *Euclid* v. *Ambler Realty Co.* [(1926)] 272 U.S. 365 [71 L.Ed. 303, 47 S.Ct. 114, 54 A.L.R. 1016]. 'Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.' [Citation.] A land use regulation does not effect a taking if it 'substantially advance[s] legitimate state interests' and does not 'den[y] an owner economically viable use of his land.' (*Agins* v. *Tiburon*, 447 US 255, 260 [65 L.Ed.2d 106, 111-112, 100 S.Ct. 2138] (1980).

"The sort of land use regulations discussed in the cases just cited, however, differ in two relevant particulars from the present case. First, they

involved essentially legislative determinations classifying entire areas of the city, whereas here the city made an adjudicative decision to condition petitioner's application for a building permit on an individual parcel. Second, the conditions imposed were not simply a limitation on the use petitioner might make of her own parcel, but a requirement that she deed portions of the property to the city." (512 U.S. at p. __ [129 L.Ed.2d at p. 316, 114 S.Ct. at p. 2316], fn. omitted.)

In responding to Justice Stevens's dissent, the court noted: "Justice Stevens' dissent takes us to task for placing the burden on the city to justify the required dedication. He is correct in arguing that in evaluating most generally applicable zoning regulations, the burden properly rests on the party challenging the regulation to prove that it constitutes an arbitrary regulation of property rights. See, *e.g., Euclid* v. *Ambler Realty Co.* [(1926)] 272 U.S. 365 [71 L.Ed. 303, 47 S.Ct. 114, 54 A.L.R. 1016]. Here, by contrast, the city made an adjudicative decision to condition petitioner's application for a building permit on an individual parcel. In this situation, the burden properly rests on the city. See *Nollan*, 483 U.S., at 836, . . . ." (512 U.S. at p. __, fn. 8 [129 L.Ed.2d at p. 320, 114 S.Ct. at p. 2320].)

The agricultural and open space easement requirements of policies 1.9a and 5.16 are part of a legislatively adopted zoning scheme intended to preserve agricultural and open space land in the San Mateo coastal zone in the event future subdivisions of land are proposed in that zone. *Dolan* makes it clear that it does not reach the type of legislative determination classifying entire areas of a county, such as we are here concerned with. Rather, its reach is limited to adjudicative decisions conditioning permit applications on particular parcels. Further, in direct contrast to the exactions in *Dolan*, the easement conditions imposed by Measure A do *not* require any subdivision applicant to deed any portion of the applicant's property to the County. Rather, the easement conditions are "simply a limitation on the use [the applicant] might make of [his or] her own parcel . . ." (512 U.S. at p. __ [129 L.Ed.2d at p. 316, 114 S.Ct. at p. 2316].)

Finally, as earlier pointed out, any purported "as applied" challenge in this case fails on ripeness grounds. The easement requirement would not arise unless and until a property owner submitted an application to divide land in the coastal zone. At that point an adjudicative decision would be made as to the appropriateness and extent of the easement requirement.

D.   *Civil Code Section 815 et seq.*

Appellants contend the agricultural and open space easements contemplated by policies 1.9 a and 5.16 of Measure A are "conservation

easements" within the meaning of Civil Code section 815 et seq. Conse-
quently, they maintain these policies violate Civil Code section 815.3,
subdivision (b), which prohibits the county from conditioning subdivision
approval on the granting of a conservation easement. The trial court properly
granted summary adjudication of this issue on the ground the easements
provided for by policies 1.9a and 5.16 are not "conservation easements" as
defined in Civil Code section 815.1. We believe the opinion letter dated July
14, 1982, from the Legislative Counsel to Assemblyman Tom Bates, the
author of Civil Code section 815.3, correctly answers this contention. The
trial court took judicial notice of this letter, which we quote:

"QUESTION

"Does the last sentence in subdivision (b) of Section 815.3 of the Civil
Code, relating to conservation easements, restrict the ability of a local
governmental entity to require the dedication of an easement under other
provisions of law?

"OPINION

"The last sentence in subdivision (b) of Section 815.3 of the Civil Code,
relating to conservation easements, does not restrict the ability of a local
governmental entity to require the dedication of an easement under other
provisions of law.

"ANALYSIS

"Chapter 4 (commencing with Section 815) of Title 2 of Part 2 of Division
2 of the Civil Code [fn. omitted] contains the provisions of state law
regarding conservation easements.[17] [¶] Section 815.3, which is located in
Chapter 4, reads as follows:

" '815.3. Only the following entities or organizations may acquire and
hold conservation easements:

" '(a) . . . . . . . . . . . . . . . . . . . . . . . . .

---

[17]"A conservation easement is defined in Section 815.1 as follows: [¶] '815.1. For the
purposes of this chapter, "conservation easement" means any limitation in a deed, will, or
other instrument in the form of an easement, restriction, covenant, or condition, which is or
has been executed by or on behalf of the owner of the land subject to such easement and
is binding upon successive owners of such land, and the purpose of which is to retain
land predominantly in its natural, scenic, historical, agricultural, forested, or open-space
condition."

" '(b) The state or any city, county, city and county, district, or other state or local governmental entity, if otherwise authorized to acquire and hold title to real property and if the conservation easement is voluntarily conveyed. *No local governmental entity may condition the issuance of an entitlement for use on the applicant's granting of a conservation easement pursuant to this chapter.*' (Emphasis added.)

"Thus, by its own terms, the last sentence of Section 815.3 applies only to Chapter 4 (commencing with Section 815) which relates only to conservation easements. [¶] Further, Section 815.9 of the same chapter provides that Chapter 4 shall not be construed to impair or conflict with the operation of any law or statute conferring upon any political subdivision the right or power to hold interests in land comparable to conservation easements, including but not limited to, specified provisions concerning easements (e.g., [citations]). [¶] . . . [¶] Accordingly, the last sentence in subdivision (b) of Section 815.3 of the Civil Code, relating to conservation easements, by its own express terms and in view of Section 815.9, does not restrict the ability of a local governmental entity to require the dedication of an easement under other provisions of law."

Appellants have not denied that there are other, existing laws which authorize a local agency to require dedication of easements as a condition of development. Clearly, the county has ample authority to require dedication of agricultural and open space easements under several provisions of law. (See, e.g., *Associated Home Builders etc., Inc.* v. *City of Walnut Creek* (1971) 4 Cal.3d 633, 644 [94 Cal.Rptr. 630, 484 P.2d 606]; *Ayres* v. *City Council of Los Angeles* (1949) 34 Cal.2d 31 [207 P.2d 1]; § 30607.)

IV.

CEQA REVIEW

Appellants challenge the trial court's grant of summary adjudication of their cause of action alleging the Commission failed to comply with the California Environmental Quality Act (CEQA) in certifying Measure A. On the motion of the Commission, the trial court granted summary adjudication on the ground that the Secretary of Resources had certified, pursuant to section 21080.5 and title 14, California Code of Regulations, section 15251, that the Commission's review and certification process for local coastal programs and amendments, such as the ones at issue here, was the functional equivalent of full CEQA review.

Section 21080.5 specifies, as did its predecessor, that the Secretary of Resources may certify that an agency's review function under separate

legislation is the functional equivalent of CEQA review. Where documents prepared pursuant to an agency's separate environmental review function essentially encompass that which would be prepared in an environmental impact report (EIR), preparation of a separate EIR would be redundant and a plan or other written document can be used in lieu of an EIR. (§ 21080.5.)

In 1979, the Secretary of Resources, pursuant to section 21080.5, certified that Commission review of original LCP submittals was the functional equivalent of CEQA review and, consequently, no separate EIR need be prepared. (See Cal. Code Regs., tit. 14, § 15251, subd. (f).) This original certification did not expressly address whether amendments to certified LCP's were similarly exempt. Therefore, in reply to an inquiry by Commission Executive Director Peter Douglas, the Secretary of Resources issued a legal opinion that the certification issued for the Commission's LCP certification activities extended to Commission review of LCP amendments, such as those here at issue.[18] (Letter dated Oct. 9, 1987, from Secretary for Resources Gordon K. Van Vleck to Peter Douglas, Executive Director of the California Coastal Commission.)

On appeal, appellants challenge neither the reasoning of the Secretary of Resources nor the legal opinion itself. Rather, they focus their claim of error upon the trial court's taking of judicial notice of this letter and declaration of authentication.[19] We believe the court properly took judicial notice of these documents under Evidence Code section 452, subdivision (c), which provides: "Judicial notice may be taken of the following matters to the extent that they are not embraced within Section 451: [¶] . . . [¶] (c) Official acts of the legislative, executive, and judicial departments of the United States and of any state of the United States." (See, e.g. *Brownell* v. *City and*

---

[18]The letter from Secretary of Resources Van Vleck provided in relevant part: "Briefly, it is the view of the Resources Agency that the certification of the Coastal Commission's LCP program, as issued by the Secretary for Resources pursuant to Public Resources Code Section 21080.5, includes both the Commission's certification of initial LCPs and LCP amendments. . . . Public Resources Code Section 21080.9 contains a legislative finding which permits the Coastal Commission's LCP procedures to qualify for certification by the Secretary for Resources under Section 21080.5, as an alternative means of complying with CEQA. Based upon the Commission's application, and consistent with the terms of Section 21080.9, the Secretary issued certification for the Commission's LCP certification activities generally, in a manner which applies to LCP amendments, as well as to the certification of initial LCPs. Hence, the Commission's certified program under Section 21080.5 includes the Commission's certification of LCP amendments."

[19]Apart from their contention that the court erred in taking judicial notice of this letter, appellants do not on appeal present any argument challenging the conclusion of the Van Vleck letter that Commission review of LCP amendments is the functional equivalent of full CEQA review. Nor do they challenge the analysis of the accompanying opinion letter supporting that conclusion.

*County of San Francisco* (1954) 126 Cal.App.2d 102 [271 P.2d 974] [letters from the United States Secretary of State to the United States Attorney General]; *Post v. Prati* (1979) 90 Cal.App.3d 626, 633-634 [153 Cal.Rptr. 511] [legislative committee reports and correspondence from the legislative analyst, a state agency and an individual legislator to the Governor]; *Watson v. Los Altos School District* (1957) 149 Cal.App.2d 768, 771-772 [308 P.2d 872] [judicially noticing reports from the state Board of Education].) The trial court did not err in granting summary adjudication on this issue.

## V.

### SINGLE-SUBJECT RULE

Appellants contend Measure A violates the single-subject rule contained in article II, section 8, subdivision (d) of the California Constitution.[20] We disagree.

Our Supreme Court reiterated the principles guiding analysis of a single-subject challenge in *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 346 [276 Cal.Rptr. 326, 801 P.2d 1077] as follows: "We have held that 'an initiative measure does not violate the single-subject requirement "if, despite its varied collateral effects, all of its parts are 'reasonably germane' to each other," and to the general purpose or object of the initiative. [Citations.]' (*Brosnahan* [v. *Brown* (1982)] 32 Cal.3d [236,] at p. 245 [186 Cal.Rptr. 30, 651 P.2d 274], quoting *Amador* [*Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978)] 22 Cal.3d [208] at p. 230 [149 Cal.Rptr. 239, 583 P.2d 1281], italics added by *Brosnahan*; [citations].)"[21]

Furthermore, we are required to resolve any reasonable doubts in favor of the exercise of the right of initiative. (*Brosnahan v. Brown* (1982) 32 Cal.3d 236, 241 [186 Cal.Rptr. 30, 651 P.2d 274].)

As characterized by appellants, Measure A embraces two distinct subjects: (1) a change in coastal land use policies and (2) off-shore oil drilling and

---

[20]"An initiative measure embracing more than one subject may not be submitted to the electors or have any effect." (Cal. Const., art. II, § 8, subd. (d).)

[21]"Our Supreme Court has stated that an initiative measure complies with the single-subject rule 'if its provisions are either functionally related to one another or are reasonably germane to one another or the objects of the enactment.' (*Harbor v. Deukmejian* (1987) 43 Cal.3d 1078, 1100. . . ; see also *Brosnahan v. Brown* [(1982)], *supra,* 32 Cal.3d at pp. 245, 247.) Whether an initiative satisfies this standard may be determined by the extent to which its provisions are germane to the general subject as reflected in the title and the field of legislation suggested thereby. [Citations.]" (*Chemical Specialties Manufacturers Assn., Inc.* v. *Deukmejian* (1991) 227 Cal.App.3d 663, 667 [278 Cal.Rptr. 128].)

onshore refineries. We reject this characterization. Measure A unquestionably satisfies the single-subject rule. The provisions of the initiative are "reasonably germane" to one another as they all deal with the planning and regulation of development in the coastal zone in order to protect coastal resources, including agricultural lands, ecologically significant habitats and scenic values. The policies addressing regulation of offshore drilling and onshore oil facilities address land use no less than any of the other policies of Measure A.

As presented to voters, Measure A was entitled "Coastal Protection Initiative." The stated purposes of the initiative are: "[¶] (1)To protect the farm lands, forests, beaches, scenic beauty and other natural resources of the San Mateo Coast from poorly located, excessive and harmful development; [¶] (2) To preserve watersheds, environmentally sensitive areas and wildlife habitats; [¶] (3) To maintain agriculture and timber uses on the Coast, including provision of housing for employees; [¶] (4) To limit urban-type development to existing urban areas; [¶] (5) To prevent the construction of onshore facilities and pipelines for offshore oil drilling; [¶] (6) To limit the costs to County taxpayers of roads, fire protection, law enforcement, and other government services by restricting distant and sprawling development on the Coastside; [¶] (7) To stabilize and make more permanent essential safeguards of the County's Local Coastal Program, by requiring that any impairment of those safeguards be approved by the voters of the County; and [¶] (8) In general, to conserve the natural heritage and beauty as well as the remarkable diversity of San Mateo County, for current and future generations, yet allow reasonable use of the land." (Measure A, § 1.)

All of these stated purposes, including those preventing construction of onshore facilities and pipelines for offshore drilling, are directed at the single general purpose expressed in the title: protection of coastal resources.

Moreover, section 2 of Measure A contains findings describing the potential degradation of coastal resources which would result from construction of extensive onshore facilities in the coastal zone, which findings clearly demonstrate the policies restricting or prohibiting the location of onshore oil facilities are reasonably germane to the purposes stated in section 1 of the initiative.

The embrace of Measure A is certainly no wider than that of either the county's preexisting LCP or the Coastal Act, both of which contain a wide variety of policies, all aimed at achieving a common purpose: protection of

significant coastal resources through land use regulation. (See § 30000 et seq.)[22] We find no violation of the single subject rule here.

## VI.

### DENSITY CREDITS

Measure A adopted the preexisting LCP scheme governing the density of new land uses in rural coastal zone areas without significant change. Policy 1.8 embodies that scheme. Policy 1.8c limits development in rural areas by requiring density credits based on projected water consumption in order to develop property for nonagricultural uses.　Appellants attack the density credit provisions of Measure A policy 1.8c as arbitrary and irrational and challenge Table 1.3, which provides the method for calculating the number of density credits allowed on a specific parcel, as violative of the Coastal Act.

A. *Policy 1.8c.*

Policy 1.8c provides that each 315 gallons per day of projected water consumption of a development shall use 1 density credit. For certain priority uses under the Coastal Act, such as public and commercial recreational uses, 630 gallons per day is equivalent to 1 density credit. Affordable housing and farm labor housing are exempted from those limitations. As the trial court recognized, this is a "debit" system of land-use regulation. Based on the characteristics of the land, a landowner of undeveloped property starts with a certain number of density credits. The more density credits a parcel has, the more intensive the development allowed. As development occurs, these credits are used and subtracted from the total available until the property is built out.

Duino, the county's principal planner, explained how the density credit system would operate in the context of proposals to develop a quarry and a hotel. In the case of a proposed quarry, if the parcel had one density credit, the applicant would be required to show how much water was going to be

---

[22]Nor does *Chemical Specialties Manufacturers Assn., Inc.* v. *Deukmejian, supra,* 227 Cal.App.3d 663, advance appellants' argument. There, the appellate court held Proposition 105 ("Public's Right to Know Act") violated the single-subject provision where the measure sought to reduce toxic pollution, protect seniors from fraud and deceit in the issuance of insurance policies, raise the health and safety standards in nursing homes, preserve the integrity of the election process, and fight apartheid. (*Id.,* at p. 671.) Unlike Measure A, Proposition 105 lacked a common purpose or object for the measure which provided a nexus linking the various provisions to one another. The common purpose of protection of coastal zone resources supplies that link here.

required for the quarry. If the amount exceeded 315 gallons per day, the application would be denied. If it were under 315 gallons per day, it would be under the maximum density and allowed, provided it met all the other tests and requirements of the LCP.[23] In the case of a hotel, because it is a recreational-visitor serving facility, one density credit would allow consumption of six hundred thirty gallons per day. The applicant would be required to show how much water demand would be generated by the hotel. Provided other policies of the LCP were met, the maximum size of the hotel would be determined by the number of density credits available. If the hotel did not use all the density credits available for the property, the owner could at some later time increase the size of the hotel or convert the available density credits to some other use.

The crux of appellants' due process challenge to policy 1.8c of Measure A is that the residential water usage measure does not relate to nonresidential uses of land and that there is no linkage between that measure and the nature of the use of the property or to the actual availability of water.

Clearly the burden is upon appellants to prove Measure A is an arbitrary or irrational land-use regulation in the face of a presumption that it is both reasonable and constitutional. (*Goldblatt* v. *Hempstead, supra,* 369 U.S. 590, 596 [8 L.Ed.2d 130, 135]; *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 160-161 [130 Cal.Rptr. 465, 550 P.2d 1001].)

Duino, the only witness who testified on this issue at trial, opined that policy 1.8 of Measure A is a reasonable regulatory tool for determining the intensity of use. Duino explained that policy 1.8c is part of the comprehensive scheme for limiting the types and density of urban development on rural lands designated for open space or agricultural uses by the LCP and for directing urban development to the urban areas of the coastal zone. Water was chosen to be used as the measure of density in 1980 when the LCP was originally adopted because water was viewed as the most appropriate of several standard planning measures for measuring density. Water was considered to be a valuable and scarce coastal zone resource for which there was much competition. Further, water usage represents a general tool applicable to the approximately 20 different land uses allowed under the applicable zoning.

The county chose 315 gallons per day as the basic measure because that was the estimate of residential water use for a single-family home in

---

[23]The number of density credits available to the parcel is not the only determinant of the size of allowable development. Other policies of the LCP also come into play when evaluating a proposed project, which might impact the size or type of development permitted, including, among others, the effect on sensitive habitats or agricultural land or other natural resources and the impact of the proposal on availability of public services and facilities.

Pescadero, a town in the rural coastal area. This amount was doubled for priority recreational uses at the suggestion of the Commission in 1980. When the original LCP was forwarded to the Commission, the Commission staff suggested that the county should do more to encourage development of recreational and visitor serving facilities on the coast in recognition of Coastal Act policy. (§ 30222.) Therefore, Commission staff proposed modifying the policy to allow a greater level of development for those types of uses. Duino testified he did not know why the 315 was doubled to 630 for such uses, rather than tripled or quadrupled, but testified that the reasoning was explained in the Commission staff report upon review of the original 1980 LCP, prior to adoption of Measure A.[24]

The county chose to use an estimate of demand rather than on-site water availability as a density measure because water availability varies significantly over time. According to Duino, using on-site water availability at a particular time as a measure would be less predictable. Further, it is more rational to plan out densities based upon the total amount of density allowed in the coastal zone. As Interveners point out, using water availability rather than consumption could promote a race among developers to consume available water supplies and leave those later in time to take their chances that any would be left.

Policy 1.8c of Measure A provides a reasonable method for calculating the maximum permissible water consumption budget for a proposed nonagricultural development on any given parcel.[25]

B. *Table 1.3.*

Appellants' sole basis for challenging table 1.3 of Measure A is their claim that table 1.3 conflicts with the Coastal Act policies encouraging the development of affordable housing and visitor serving recreational facilities.

[24]At trial, plaintiffs did not address that staff report, choosing to rest on Duino's acknowledgment that he was at that moment unable to recall its specific explanation for doubling the water allowance in case of recreational facilities. We will not assume from this state of the evidence that 630 gallons was an arbitrary or irrational figure. Duino's testimony makes clear that there was an explanation, contained in the Commission staff report at the time of the 1980 LCP certification proceedings.

[25]Appellants hypothesize that the use of density credits will not provide a way of determining intensity of use if the proposed use consumes little or no water. However, we agree with county that as most development does need water, appellants' scenarios are speculative at best. Appellants cannot prevail by showing merely that particular applications of the statute at some future date might create a constitutional conflict. They must demonstrate that the statute "inevitably pose a present, total and fatal conflict with applicable constitutional provisions and prohibitions." (*Pacific Legal Foundation* v. *Brown* (1981) 29 Cal.3d 168, 180-181 [172 Cal.Rptr. 487, 624 P.2d 1215].)

(Table 1.3 applies in areas of the coastal zone designated by the LCP for rural uses and implements policy 1.8 by setting forth the method for calculating the maximum number of density credits that will be awarded any legal parcel. One density credit shall be allowed for every forty to one hundred sixty acres of land, depending on the listed category it falls within.)[26]

This claim is clearly a "backdoor" challenge through traditional mandate and declaratory relief to the Commission's certification of Measure A as consistent with the Coastal Act. As noted before (fn. 9, *ante*), the proper method for such challenge is through bringing of a petition for a writ of administrative mandamus pursuant to Code of Civil Procedure section 1094.5. (E.g., *City of Chula Vista* v. *Superior Court, supra,* 133 Cal.App.3d 472, 488; *State of California* v. *Superior Court (Veta), supra,* 12 Cal.3d 237, 249; see *Sierra Club* v. *California Coastal Com., supra,* 12 Cal.App.4th 602, 609.) It is established the Commission acts in a quasi-judicial role when it reviews a LCP or LCP amendment for consistency with the Coastal Act. (*City of Chula Vista* v. *Superior Court, supra.*) Consequently, challenge to the Commission's actions in LCP certification decisions is via Code of Civil Procedure, section 1094.5.[27]

Appellants never pursued such a challenge and on appeal they neither argue that the Commission's decision was unsupported by substantial evidence, nor cite to the administrative record. In such circumstance, we will not canvass the administrative record, but will reject appellants' challenge to table 1.3 of Measure A.

## VII.

### POLICY 5.22

Appellants contend policy 5.22 of Measure A conflicts with and is preempted by article X, section 2 of the California Constitution and section 100 of the California Water Code. Appellants do not attempt to brief this issue, stating only that "the documents (i.e., Policy 5.22 and pertinent Cal. Const. and Wat. Code provisions) speak for themselves" and attempting to incorporate by reference four paragraphs of their first amended complaint.

---

[26]We note that affordable housing and farm labor housing are not subject to the density credit requirements of policy 1.8c and table 1.3.

[27]Significantly, in such actions the only evidence before the court is the administrative record of the Commission's decision. A deferential standard of review applies. If substantial evidence supports the Commission's action, we affirm; if not, we reverse. (*City of San Diego* v. *California Coastal Com.* (1981) 119 Cal.App.3d 228, 232 [174 Cal.Rptr. 5]; *Sierra Club* v. *California Coastal Com., supra,* 12 Cal.App.4th 602, 609-611.)

Clearly, appellants have waived this issue on appeal by failing to support it by argument or citation of authority. ( *Downey Savings & Loan Assn.* v. *Ohio Casualty Ins. Co.* (1987) 189 Cal.App.3d 1072, 1090 [234 Cal.Rptr. 835]; *Kim* v. *Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 [21 Cal.Rptr.2d 834]; Eisenberg et al., Civil Appeals & Writs (The Rutter Group 1994 rev.) ¶ 9:21, p. 9-5.) Incorporation by reference of the allegations of the complaint is an inadequate substitute for appellate argument.[28]

The judgment is affirmed.

Phelan, J., and Haerle, J., concurred.

Appellants' petition for review by the Supreme Court was denied December 21, 1995.

---

[28]In a letter brief in response to our request for briefing on the applicability of *DeVita*, appellants for the first time contend that the supermajority vote requirement of Measure A unlawfully amends the county charter. (Letter brief filed Apr. 18, 1995, p. 4.) We do not address this claim as appellants have waived it both by failing to raise it below and by failing to raise it in their opening or closing briefs. (Eisenberg et al., Civil Appeals & Writs, *supra*, ¶¶ 8:171, 8:229, 9:78, pp. 8-66.4, 8-79, 9-18.1.)